210 P.3d 22

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Shane MARK, Defendant–Appellant (Criminal No. 03–1–0495).**

**State of Hawai'i, Plaintiff–Appellee,**

v.

**Shane Mark, Defendant–Appellant (Criminal No. 03–1–0496).**

**Nos. 26784, 26785.**

Intermediate Court of Appeals of Hawai'i.

May 8, 2009.

---

Dwight C.H. Lum, Honolulu, on the briefs, for Defendant–Appellant.

Donn Fudo, Deputy Prosecuting Attorney, City and County of Honolulu, on the briefs, for Plaintiff–Appellee.

RECKTENWALD, C.J., NAKAMURA and LEONARD, JJ.

Opinion of the Court by
RECKTENWALD, C.J.

## I. INTRODUCTION

On March 4, 2003, Honolulu police received a tip concerning Defendant–Appellant Shane Mark. The caller reported that Mark would be at the Baskin–Robbins ice cream parlor in the Kapolei Shopping Center at about noon. Mark was wanted on a warrant in connection with a February 1, 2003 incident in which he allegedly shot Denny Paikai in the leg, and fired shots at John Piko.

A team of plainclothes Honolulu police officers, including Officer Glenn Gaspar, went to the Baskin–Robbins to arrest Mark. Officer Gaspar and Officer Calvin Sung approached Mark and attempted to place him under arrest. A struggle ensued and Mark, who was armed, fired three shots. Officer Gaspar was fatally wounded. Other officers assisted Officer Sung in subduing Mark, and placed him under arrest.

Two indictments were returned against Mark. In Criminal No. 03–1–0495 (*Mark I*), Mark was charged with the attempted murder in the second degree of Piko (Count I) and Paikai (Count II), in violation of Hawaii Revised Statutes (HRS) §§ 705–500 (1993), 707–701.5 (1993), and 706–656 (1993 & Supp.

1996); carrying, using, or threatening to use a firearm in the commission of a separate felony in connection with the attempted murder of Piko (Count III) and Paikai (Count IV), in violation of HRS § 134–6(a) and (e) (Supp.1999); and ownership or possession prohibited of any firearm or ammunition by a person convicted of certain crimes, in violation of HRS § 134–7(b) and (h) (2004) (Count V).

In Criminal No. 03–1–0496 (*Mark II*), Mark was charged with the murder in the first degree of Officer Gaspar, in violation of HRS §§ 707–701(1)(b) (1993 & Supp.2001) and 706–656 (Count I); the attempted murder in the first degree of Officer Sung, in violation of HRS §§ 705–500 and 707–701(1)(a) (Count II); carrying, using, or threatening to use a firearm in the commission of a separate felony, in connection with the murder of Officer Gaspar, in violation of HRS § 134–6(a) and (e) (Count III); possession prohibited of any firearm by a person convicted of certain crimes, in violation of HRS § 134–7(b) and (h) (Count IV); promoting a dangerous drug in the third degree, in violation of HRS § 712–1243 (1993 & Supp. 2002) (Count V); and unlawful use of drug paraphernalia, in violation of HRS § 329–43.5(a) (1993) (Count VI).

The Circuit Court of the First Circuit[1] (circuit court) consolidated the cases at Mark's request, and they were tried to a jury in December 2003.[2] On December 22, 2003, the jury returned a verdict on some of the counts. The jury found Mark guilty of murder in the second degree of Officer Gaspar, rather than the charged offense of murder in the first degree (*Mark II*, Count I).[3] The

---

1. The Honorable Karen S.S. Ahn presided.

2. Prior to trial, Mark pleaded no contest to Count V in *Mark I* and no contest to Counts IV, V, and VI in *Mark II*. Accordingly, those charges were not submitted to the jury.

3. The relevant provisions applicable to those offenses provide that:
 § 707–701 **Murder in the first degree.** (1) A person commits the offense of murder in the first degree if the person intentionally or knowingly causes the death of:
 (a) More than one person in the same or separate incident;

(b) A law enforcement officer, judge, or prosecutor arising out of the performance of official duties;
 . . . .
 (2) Murder in the first degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.
 § 707–701.5 **Murder in the second degree.** (1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
 (2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

jury also found him guilty on Count III in *Mark II*, and Counts II and IV in *Mark I*.

The jury was unable to reach a unanimous verdict as to the charges relating to Piko and Officer Sung. The circuit court declared a mistrial and delayed sentencing until after a retrial. A second trial was held in July 2004. The jury found Mark guilty of the attempted assault in the first degree of Officer Sung, rather than the charged offense of attempted murder in the first degree (*Mark II*, Count II), but was unable to reach a verdict as to the charges relating to Piko (*Mark I*, Counts I and III). The circuit court then dismissed those charges.

At sentencing, the State of Hawai'i (State) moved for extended terms of imprisonment. The circuit court denied the motion with regard to the counts of conviction in *Mark I*, but granted it with regard to the counts of conviction in *Mark II*, finding that Mark was a persistent and multiple offender and that extended terms of imprisonment were necessary for the protection of the public. Accordingly, the circuit court sentenced Mark to an extended term of imprisonment of life without the possibility of parole for Count I in *Mark II*, rather than the term of life with the possibility of parole that would otherwise apply to a second degree murder conviction. *See* HRS § 706–661 (Supp.2003). The court also imposed extended terms of imprisonment on the other counts of conviction in *Mark II*.

Mark now appeals from the judgments entered on August 2, 2004 in both cases. On appeal, Mark advances a number of grounds for reversing or vacating his convictions. He argues that the circuit court erred by (1) granting in part the Honolulu Police Department's (HPD) motion to quash a subpoena for certain Internal Affairs Division records; (2) admitting a slow motion version of a videotape taken during the incident at the Baskin–Robbins and refusing Mark's proposed jury instructions on the videotape; (3) incorrectly instructing the jury on the justification of defense of others in the first and second trials; (4) referring the jury back to

the court's instructions in response to a communication during deliberations in the first trial; (5) denying his motion for mistrial and his counsel's motion to withdraw during the second trial after it was discovered that the Office of the Public Defender (OPD) had represented Piko; and (6) denying his motion for a mistrial after it was discovered during the second trial that Piko believed that he had made a deal with the State in exchange for his testimony in the first trial, and after a juror received an anonymous voice mail which suggested that the juror should "watch [her] back." Mark further argues that he was denied a fair trial and impartial jury in the first trial based on factors including prejudicial publicity and the prosecutor's questioning of witnesses during trial, and that there was insufficient evidence to convict him of the attempted assault in the first degree of Officer Sung in the second trial.

For the reasons set forth below, we conclude that Mark's contentions are without merit, and accordingly, we affirm all of his convictions.

Mark also argues that the extended term sentences in *Mark II* violated his constitutional rights, because the circuit court made factual findings that should have been made by a jury. The State concedes, in light of the Hawai'i Supreme Court's decision in *State v. Maugaotega*, 115 Hawai'i 432, 168 P.3d 562 (2007), that the extended term sentences were not imposed in accordance with constitutional requirements.[4] We agree that resentencing is required in light of *Maugaotega*, and accordingly vacate the extended term sentences imposed by the circuit court in *Mark II*, and remand for resentencing on those counts.

## II. FACTUAL BACKGROUND

The relevant factual background, as developed at the first trial,[5] is as follows:

### A. February 1, 2003 Incident at Church Parking Lot

On the evening of February 1, 2003, three groups of people met at a church parking lot

4. *Maugaotega* was decided several years after the circuit court imposed sentence in this case.

5. The evidence at the second trial was largely similar, with several differences that we discuss below.

in Moanalua. Paikai and Piko arrived first in one vehicle, Mark and his girlfriend Leslie Martin arrived next in a car which they had borrowed from a friend, and then Russell Kimura and his girlfriend Carle Enosara arrived in Kimura's vehicle. The purpose of the meeting was for Kimura to return a surveillance camera which he had obtained from Mark. Kimura wanted to return the camera because he said it did not work properly. According to Mark, he had purchased the camera from Piko and an individual named Kimo, and then resold it to Kimura. Mark testified that he believed that Kimo and Piko were going to accept the camera back and refund the purchase price. In contrast, Piko testified that although he expected the camera to be returned to him at the parking lot, he did not understand that he was going to refund any money at that time.

The State called Piko and Paikai as witnesses at trial. Piko testified that the meeting in the church parking lot had been arranged earlier that day. That evening, Piko and Paikai went to the church and waited for the others to arrive. When they did, Piko walked over to talk to them. Piko "went go for grab the camera, and they was like, oh, if we get the money." Piko testified that "nobody told [Piko] about no money." Piko then walked over to Kimura's car and explained to Kimura that although he wasn't told he needed to bring cash for the camera, Paikai knew someone who wanted to buy the camera right away. They could follow Piko and Paikai to meet that person, and Piko could then refund Kimura the money. Kimura agreed, but said he didn't want to follow them. Instead, he said Mark and Martin could go with Piko and Paikai and collect the money on his behalf.

Piko again reached to take the camera from Mark, but Mark was "moving around" and pulled the camera back as if Piko "was gonna rip him off or something." Piko got "irked" and said, "what if I just take this from you, what you goin' do?" Mark then handed Piko the camera and pulled out a gun

from his waistband. Piko was wearing only shorts, and was unarmed. Mark pointed the gun at Piko's head from a distance of about one foot. Piko lifted the camera box to cover his face, heard a gunshot, and ran. As Piko jumped up over a rock wall and ran through some bushes toward some apartments, he heard an additional 5 to 7 shots. Piko turned back and saw Mark running after him while shooting at him.

Paikai testified that at the parking lot, Piko walked over to talk to Mark and Kimura. When the conversation started to get "kinda heated," Paikai walked toward them. Paikai saw Mark give Piko the camera and pull a gun. Mark pointed the gun at Piko's head from a distance of about 18 inches and fired a round. Piko turned and ran, holding the box up behind his head. Mark fired one or two more rounds.

Mark ran after Piko, then "turned his sights on [Paikai]." Mark aimed the gun at Paikai and was trying to shoot him. Paikai ran closer to Mark's car and "bobbed" to make it harder for Mark to shoot him. Paikai got down on the ground and "was gonna crawl underneath the car." Paikai thought Mark fired two more shots before finally shooting him in the leg. Paikai ran off, but saw Mark get back in the car with Martin and begin to drive. Paikai then saw them make a U-turn and drive back towards him. Paikai then went to a military guard shack for help.

The defense called Mark, Kimura, and Enosara as percipient witnesses to the incident.[6] Mark testified that he bought the camera from Kimo and Piko in January 2003, and resold it to Kimura. Kimura called Mark a few days later and said that the camera did not work. Mark told Kimura that he would attempt to get Kimura's money back.

Mark also testified that sometime in January, Darren Nakahara gave Martin a gun, and Martin gave the gun to Mark.[7] Mark testified that he called Nakahara three times

---

6. Neither the State nor Mark called Martin as a witness at either trial.

7. On cross-examination, the deputy prosecuting attorney (DPA) asked Mark if he had given Nakahara something for the gun, and Mark denied

that he had done so. Nakahara did not testify at the first trial, but testified at the second trial that Mark had come to his house looking for a gun, and Nakahara sold him a gun for $100.

and told him to pick up his gun, but Nakahara never came.

On February 1, 2003, Mark and Martin borrowed a friend's car and went to 99 Ranch Market where they ran into Kimo, Paikai, and Piko and arranged the meeting at the church parking lot. Kimo told Mark that if he brought the camera back, Kimo would refund his money. Before going to the church, Mark went home and picked up the gun because he and Martin "finally got a vehicle" and wanted to return the gun to Nakahara after the meeting in the parking lot. Martin drove Mark to the parking lot, where Piko and Paikai were already waiting. Piko and Paikai told Mark that they had dropped Kimo off somewhere, which Mark thought was strange because Kimo had sold Mark the camera and it "was his deal." Piko and Paikai also told Mark that they had the money with them, so they all waited for Kimura to arrive with the camera so they could carry out the exchange. Mark went back to the car to wait with Martin. After Kimura and Enosara arrived, Mark took the camera from Kimura and returned to his car. Martin remained in the driver's seat. It appears that Mark stood outside the vehicle.

Mark testified that Piko and Paikai then approached him from different directions, causing Mark to feel "[p]retty frightened" because he "thought they [were] going to do something to us." He stated that they were "walking pretty rough," so he "grabbed the gun ... and ... put it in [his] waist." Mark said that he got the gun for "protection, safety" because he was concerned about Martin, whom he knew was pregnant with their child, as well as Enosara. Piko approached the car first and told Mark and Martin to follow them to another location. Mark agreed, but only to get them to go away. He did not plan on following Piko and Paikai because he considered the location to be unsafe.

Mark testified that Piko wanted the camera, but Mark said he needed the money first. Piko then hit Mark's car hard with his hand, reached for the camera and stated, "we just going take the camera away from you, what you going do?" Mark gave Piko the camera. Piko smiled, turned towards Mark,

and said, "we just going take everything from you[,]" which Mark interpreted to mean that he and Martin were going to be robbed. Mark also thought he was going to get beat up, and was also worried that Martin would come out of the car and try to stop Piko and Paikai from beating him up. Mark then pulled out the gun, intending to scare them away, pointed it above Piko's head, and shot a round. Piko then ran behind Kimura's truck. Mark followed him with the gun, but could not find him.

Paikai then ran toward Mark's car and knelt down. Kimura and Enosara drove away. Mark testified that Paikai "was coming around the car towards [him]," and Mark thought he might have a weapon. Mark was standing next to the driver's side window, where Martin was seated. Mark "reached over the car, and when [Paikai] was about to turn the corner by the headlights by the front fender, [Mark] shot him in his leg." Mark testified that he intended to shoot Paikai in the leg rather than in the body because he just wanted to stop Paikai. After being shot, Paikai did not pull out a weapon or attempt to go after Mark. Mark testified that he wanted to take Paikai to the emergency room, but Paikai ran to a guard shack and yelled at the MPs that he had been shot. The MPs pointed their guns at Mark, so he and Martin drove away.

Kimura testified that after he and Enosara arrived at the parking lot, two men whom he didn't know came out of a car and spoke to Mark. The men didn't have the money, and Mark didn't want to give them the camera until they had the money. The men said Kimura could follow them to their house to get the money, but Kimura didn't want to do so and told Mark to take the camera and take care of it for him. At some point, the man standing between Kimura and Mark's car said, "what if I just take 'em from you, what you going do?" Kimura testified that after the man pushed Mark, Mark gave him the camera, and the man ran. Kimura also testified that he heard a gunshot. At that point, he started to drive away and heard several more gunshots. He saw the second man duck in front of Mark's car.

Enosara testified that one of the two men wanted Mark to give him the box, but Mark refused until he got the money. The man pounded on Mark's car, and said, "how about if I just take the box from you?" That man walked up to Mark from the back of the vehicle, and Mark pushed the box at him while the other man came around from the front of the vehicles. Kimura and Enosara started to leave, and she heard two gunshots as they drove off.

## B. Events Subsequent to the February 1, 2003 Incident

Mark also offered evidence about events after the shooting in the church parking lot, which he said caused him to suspect that he and Martin were being followed and threatened. Mark testified that he heard on approximately ten occasions after the shooting that people were looking for him. This caused Mark and Martin to move around a lot "[b]ecause these guys know a lot of people, and the word might get around where [they]'re at." Mark kept the gun with him at all times. Mark was concerned about turning himself in to police because he was afraid that he would not be able to protect Martin and their unborn child, and because Piko and Paikai had relatives and "boys" in prison who would threaten his safety there.

Mark went to see a lawyer to get help in turning himself in and for representation in court. Myles Breiner, a criminal defense attorney, testified that Mark and Martin came to his office in February 2003. The couple "seemed very desperate and very anxious." Breiner advised Mark to turn himself in immediately, and offered to arrange a self-surrender the following day. Martin and Mark indicated that they would return "sometime that week . . . and arrange to turn themselves in[,]" but they did not do so. Mark testified that he wanted to find Martin a safe place to stay and visit with his daughter, who was on the island for approximately one week, before turning himself in.

Manuel Torres testified that at the time of the incident at the church parking lot, Mark was living with him a "[f]ew days here and there." One morning as Torres was getting ready for work, he noticed that Mark, who was sleeping on a bed in the living room, had a gun about 10 inches from his hand. Torres woke Mark, and then finished making his lunch for work. Mark came to Torres's room, crying, and told Torres that he shot someone and was afraid that they were looking for him.

Blaine Roque testified that Mark and Martin stopped by his house the evening of the parking lot incident, but that they did not mention the incident to him. Some time later, Paikai stopped by Roque's house and "started beating around the bush about that he the one got shot from [Mark]." Roque later spoke to Martin on the phone and told her "[t]o be careful, because Paikai and his boys was looking for [Mark]."

## C. March 4, 2003 Incident at the Baskin–Robbins

Melissa Sennett testified that she and Mark had dated for several years in the early 1990's, and that they had a daughter (Daughter) who was born in 1992. Sennett testified that she traveled to Hawai'i with her current boyfriend John Scott Kortz and Daughter at the end of February 2003 so that Daughter could visit Mark and her family. Sennett and Daughter saw Mark on three occasions while they were in Hawai'i, the last being March 4, 2003. Sennett spoke with Mark on the morning of the 4th, and they agreed to meet at the Baskin–Robbins in Kapolei. While Sennett was in Hawai'i, she had learned that police were looking for Mark. She called Crime Stoppers on the morning of the 4th and told them about the meeting, and subsequently spoke with Lieutenant William Kato and Detective Bruce Swann to discuss the details of the meeting.

Lt. Kato testified that on March 4, 2003, he was the supervisor of a plainclothes detail that arrested persons wanted on warrants. Detectives Swann, Kenneth Higa, and Shannon Kawakami, as well as Officers Gaspar and Sung, worked with Lt. Kato on the detail. Officer Gaspar wore a red and white floral aloha shirt and white slacks that day and wore his aloha shirt untucked so that the items on his belt, including his gun, badge, and police ID, were covered. Officer Sung

also wore his shirt untucked so that it "just covers the gun and the badge."

Lt. Kato testified that he was told that Sennett had called Crime Stoppers and was on the phone. Sennett told Lt. Kato that she had a meeting with Mark that day so that Mark could see Daughter, and that she wanted the police to meet them and arrest Mark. Lt. Kato asked Sennett if she thought Mark would come to the meeting armed, and Sennett replied, "no, he would never do that around our daughter." Lt. Kato told Sennett to firm up the plans with Mark, and to call back with the details, which she did.

Lt. Kato further testified that Sennett called back and told Det. Swann that the meeting with Mark would take place around 12:00 noon at the Baskin–Robbins in the Kapolei Shopping Center. The plainclothes detail confirmed Mark's outstanding warrant for the prior shooting incident and obtained a photograph of Mark. Lt. Kato left the main police station for the Baskin–Robbins in an unmarked van with Dets. Swann, Higa, and Kawakami, and Officers Gaspar and Sung. On the way to the Baskin–Robbins, Sennett called Lt. Kato on his cell phone. Lt. Kato told Sennett that Officers Gaspar and Sung would enter the store first, and instructed her to leave with Daughter and Kortz when she saw them enter.

Sennett called again and told them that "everybody was late." Lt. Kato and Det. Swann went into Dunkin' Donuts, about two or three doors down from the Baskin–Robbins, and watched the scene. The other four officers waited in the van. The plan was that once Mark entered the store, Officers Sung and Gaspar would enter after him, and Det. Swan and Lt. Kato would follow. As the four officers entered on foot, Dets. Higa and Kawakami would pull the van to the front of the store.

Officer Sung testified that a little over an hour after the officers arrived, he saw a man matching Mark's description at the Baskin–Robbins. Officer Gaspar then entered the store, followed by Officer Sung. To the left of the cash register was the customer area with tables and an ice cream cake refrigerator. Officer Sung saw Mark standing with his back to the refrigerator, facing the officers.

Officers Gaspar and Sung nodded at each other, indicating they had positively identified Mark, and they turned toward him. Officer Gaspar "lift[ed] up his aloha shirt displaying his badge[,]" and said to Mark, "[C]an we talk to you for a minute[?]" Officer Sung also lifted up his shirt showing his badge and followed Officer Gaspar.

Officer Sung testified that Mark looked at the officers and appeared to also look at Officer Gaspar's badge. Officer Sung then saw Mark reach for something in his right pants pocket, "and from [Officer Sung's] police training and experiences [sic], usually when they reach for something in their pocket, usually it means [a] weapon[.]" Officer Sung told Mark, "Put your hands up, police," and continued to approach Mark. Officer Gaspar grabbed Mark, using his left hand to grab Mark's right wrist, and his right hand to grab Mark's left wrist. Officer Sung tried to grab Mark's right arm in order to handcuff and arrest him. Mark "leaned forward and ... kind of tucked himself in, resisting arrest," and Officer Sung lost control of Mark's elbow. Officer Sung "kept on reach[ing] for his right hand because [Officer Sung] knew something was up, because [Mark] was reaching for his right pants pocket ... but [Mark] kept back-pedaling, tuck[ing] himself in[.]" Officer Gaspar was also reaching for Mark's arm.

During the struggle, the three men pushed through a swinging door into the employee area, while both officers continued to reach for Mark's arm. Officer Sung heard Officer Gaspar say, "You're under arrest, police[,]" and repeat "[p]olice, police." Officer Sung also said "police" four to five times. The officers pulled Mark up to more of a standing position, and Officer Sung saw that Mark had a gun in his right hand and was pointing it at the officers. Officer Sung tried to push Mark to the ground "so he cannot shoot anybody," but heard two shots go off. Around that time, Officer Sung realized that Det. Higa had also become involved in the struggle.

Officer Gaspar then said, " 'I'm shot' [ ] kind of in·a shocking voice, and then [the officers] managed to bring [Mark] down to

the ground." As they hit the floor, one more shot went off. Someone yelled "stop resisting." Mark, who was face down on the floor, was "curling his firearm, pointing the muzzle of the gun toward [Officer Sung's] face[.]" Officer Sung tried to rotate Mark's wrist to point the gun away from him and toward the freezer area, but Mark was "incredibly strong." Mark "kept on flexing, and [the gun] was pointed at [Officer Sung's] face at least [a] couple times." Officer Sung started "punching the back of [Mark's] body" and "biting his tricep area to make him drop the gun[,]" but Mark still did not drop the gun. Officer Sung then heard Det. Higa say, "I got the gun," and the officers handcuffed Mark.

Dets. Kawakami and Higa testified that they pulled the van to the front of the store and observed Officers Gaspar and Sung struggling with Mark. Det. Higa testified that he jumped out of the van and ran into the store, and "grabbed [Mark] [ ] in a bear hug." Det. Higa yelled "police, stop resisting" a couple of times, and about five seconds later, heard two popping noises. They fell to the ground, with Mark landing on his stomach and Det. Higa on top of Mark. Det. Higa yelled "police, stop resisting," and about five seconds later heard a third shot. Det. Higa heard Officer Gaspar say, "I've been shot." Mark continued to struggle, and Det. Higa eventually pulled Mark's right hand out from under him. Mark was holding a gun, and pointed it at Det. Higa and then at Officer Sung. Det. Higa pulled the gun from Mark's hand.

Det. Kawakami testified that he locked the van, and as he came to the sidewalk in front of the store, he heard three gunshots. He saw Officers Gaspar and Sung struggling with Mark on the floor, and observed a gun in Mark's right hand, pointed at Officer Sung.

Sennett testified she arrived at the Baskin–Robbins with Kortz and Daughter and waited for Mark. After they waited for about 20 minutes, Mark entered the Baskin–Robbins, hugged Daughter, then stood behind her and unclasped a necklace he had brought for her. Kortz videotaped the interaction "[s]o that [Daughter] would have something with her dad."

Sennett testified that two men in aloha shirts entered the store, paused at the counter and then approached Mark. At that point, she assumed that they were police officers. Sennett testified that when Mark saw the officers, he "started to back up a little[,]" dropped the necklace, and he "grabbed like toward his pocket." Sennett thought "he was going for a gun or something." As the officers grabbed Mark, they said, "Shane Mark, you need to come with us, you're under arrest." Sennett testified that "by that time [she] was reaching over grabbing [Daughter] ... [she] heard the pop-pop, ... pushed [Daughter] to [Kortz] and said take her[.]"

Kortz testified that when Mark arrived, Mark hugged Daughter and pulled out a small necklace. Kortz had a digital camcorder with him, and began filming when he realized Mark was giving Daughter a gift. Kortz testified that at that point, two men walked past him and said something to Mark, who started to back up. Kortz heard Mark say "[w]hat the fuck," and believed that he heard the men say "Shane Marks." The men started to grab for Mark's wrists and a struggle ensued, and Kortz shut off the camera. Kortz heard two gunshots while the men were still standing, and a third while they were on the ground. When they were on the ground, Kortz saw Mark with a gun, but Mark did not appear to be aiming the gun, but rather just cocked it and "hop[ed] to hit somebody or something[.]"

Officer Gaspar was transported to Saint Francis Medical Center where he was pronounced dead. An autopsy revealed that he died from two gunshot wounds to his chest and abdomen. A third gunshot shattered the glass on Officer Gaspar's cell phone, and the bullet lodged itself in his magazine pouch.

The witnesses for the defense included Mark, several Baskin–Robbins employees, and a customer who was in the store at the time of the incident. Mark testified that he visited with Daughter three times after his meeting with Breiner, and that he carried the gun in his waistband during each of those visits. On his third and final visit, Mark and

Martin went to the Baskin–Robbins to see Daughter. When they arrived, Mark patted Daughter on the back, then stepped back and took out a necklace that he had purchased for her.

As Mark was attempting to put the necklace around Daughter's neck, two "regular" looking men in "casual" clothes whom Mark had never seen before "tr[ied] to grab [him]." Mark thought that "[b]ecause of all the threats" to his safety over the past few weeks, these men were going to "pull [him] out of the store" and "[t]ake [him] someplace and kill [him]." As the men grabbed Mark's arms, Mark heard them say, "Put your hands up, put your hands up." Mark then "[t]ried for get these guys off of [him]" because he didn't know who they were and thought that they were "robbing the place." The men were grabbing him and trying to move him out the door. Mark was scared for Daughter's safety, and moved the men away from her into the back area where the employees were. A third man came and placed him in a bear hug from the back, while the other two remained on each side.

Mark was able to get his right hand free, and grabbed the gun from his waist. He checked to "make sure it wasn't pointing towards my daughter them [sic], and I turned to the side like this (indicating), and then I shot him one time." He shot in order to "[g]et these guys off of me." After the first shot, "[t]he grips got tighter" so he "shot two more times." The men continued to struggle over the gun. Mark testified that at that point, he was not aiming the gun anywhere or pointing it at anyone, and that he had finished shooting. He stated that he did not shoot to kill, he did not intend to kill Officer Gaspar or Officer Sung, and that he did not intend to hurt or kill any police officer. Had he known the men were police officers, he "would have stopped and listened to every command they told [him]" because then he "would know that [his] daughter them [sic] would be safe."

Shannon Limatoc, a Baskin–Robbins employee, testified that when Officers Sung and Gaspar were struggling with Mark, she thought it was a "fight," and told them "not to do that in the store and just get out." She did not hear anyone say "police," "you're under arrest," or "stop resisting." However, she did not see or hear the beginning of the confrontation because she was waiting on a customer, and only noticed the struggle after Mark and the officers had pushed through the swinging door to the employee area. Two other Baskin–Robbins employees testified similarly.

Milton Miller testified that he was a customer in the store at the time of the incident. As he walked up to the counter, he noticed a group of people to his left, including a young girl sitting at a table, two adult females, and a male "standing behind the table and in between the table and the ice cream freezer." Miller ordered his ice cream, and as he began to pay he saw "a scuffle occurring" to his left. Miller testified that he observed "two people [whom he] hadn't seen up until then struggling with" the male he observed when he walked in, and that they were "banging against the glass case and the freezer[.]" He heard one of the employees yell, "hey, take it out of here or get it out of here," but did not recall hearing anything else other than a series of gunshots. Although Miller speculated that the two men were policemen, he did not recall seeing or hearing anything that identified them as officers, although he was not looking at them as they approached the back of the store.

## III. STANDARDS OF REVIEW

### A. Motion to Quash

We review the circuit court's denial of a motion to quash a subpoena for abuse of discretion. *State v. Estrada*, 69 Haw. 204, 216–17, 738 P.2d 812, 821–22 (1987).

### B. In Limine Orders—Admissibility of Evidence

Because "the granting or denying of a motion in limine is within the trial court's inherent power to exclude or admit evidence, we review the court's ruling for the abuse of discretion standard." *State v. Kealoha*, 95 Hawai'i 365, 379, 22 P.3d 1012, 1026 (App.2000) (internal quotation marks, citations, and brackets omitted). However, when the trial court's order granting a mo-

tion in limine is an evidentiary decision based upon a decision that can "yield only one correct result," the standard of review is the right/wrong standard. *Walsh v. Chan,* 80 Hawai'i 212, 215, 908 P.2d 1198, 1201 (1995); *Ass'n of Apt. Owners of Wailea Elua v. Wailea Resort Co., Ltd.,* 100 Hawai'i 97, 110, 58 P.3d 608, 621 (2002) (decisions regarding relevance are reviewed under the right/wrong standard).

## C. Motion for Mistrial

■ The denial of a motion for mistrial is within the sound discretion of the trial court and will not be upset absent a clear abuse of discretion. The trial court abuses its discretion when it clearly exceeds the bounds of reason or disregards rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Lagat,* 97 Hawai'i 492, 495, 40 P.3d 894, 897 (2002) (internal quotation marks and citations omitted).

## D. Motion for Continuance

■ "A motion for continuance is addressed to the sound discretion of the trial court, and the court's ruling will not be disturbed on appeal absent a showing of abuse of that discretion." *State v. Lee,* 9 Haw.App. 600, 603, 856 P.2d 1279, 1281 (1993).

## E. Jury Instructions

■ In *State v. Nichols,* 111 Hawai'i 327, 141 P.3d 974 (2006), the Hawai'i Supreme Court held that

although as a general matter forfeited assignments of error are to be reviewed under [Hawai'i Rules of Penal Procedure (HRPP)] Rule 52(b) plain error standard of review, in the case of erroneous jury instructions, that standard of review is effectively merged with the HRPP Rule 52(a) harmless error standard of review because it is the duty of the trial court to properly instruct the jury. As a result, once instructional error is demonstrated, we will vacate, without regard to whether timely objection was made, if there is a reasonable possibility that the error contributed to the defendant's conviction, *i.e.,*

that the erroneous jury instruction was not harmless beyond a reasonable doubt.

*Id.* at 337, 141 P.3d at 984 (footnote omitted).

■ "When jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading." *State v. Gonsalves,* 108 Hawai'i 289, 292–93, 119 P.3d 597, 600–01 (2005) (internal quotation marks and citation omitted) (quoting *State v. Arceo,* 84 Hawai'i 1, 11, 928 P.2d 843, 853 (1996)).

## F. Responses to Jury Communication

■ "Because the circuit court's response to a jury communication is the functional equivalent of an instruction, the standard of review for jury instructions also applies to reviewing a trial court's answers to jury communications." *State v. Miyashiro,* 90 Hawai'i 489, 492, 979 P.2d 85, 88 (App.1999).

## G. Motion To Withdraw As Counsel

■ A motion to withdraw as counsel is subject to the "approval of the court," Hawai'i Rules of Penal Procedure Rule 57, and the court's decision is reviewed for abuse of discretion. *See State v. Ahlo,* 2 Haw.App. 462, 469, 634 P.2d 421, 426–27 (1981) ("In this case, the proposed change came at the end of the prosecution's case and toward the end of a long trial. We see no abuse of discretion in the court's refusing to allow the withdrawal [of defense] counsel....").

*State v. Plichta,* 116 Hawai'i 200, 214, 172 P.3d 512, 526 (2007).

## H. Findings of Fact/Conclusions of Law

■ A trial court's findings of fact are reviewed under the "clearly erroneous" standard of review. *Dan v. State,* 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994).

A finding of fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding, or (2) despite substantial evidence in support of the finding, the appellate court is nonetheless left with a definite and firm conviction that a mistake has been made. The circuit court's conclu-

sions of law are reviewed under the right/ wrong standard.

*State v. Locquiao,* 100 Hawai'i 195, 203, 58 P.3d 1242, 1250 (2002) (internal quotation marks and citations omitted) (quoting *State v. Harada,* 98 Hawai'i 18, 22, 41 P.3d 174, 178 (2002)).

■ "A conclusion of law that is supported by the trial court's findings of fact and that reflects an application of the correct rule of law will not be overturned." *Dan,* 76 Hawai'i at 428, 879 P.2d at 533 (internal quotation marks and citations omitted).

## I. Prosecutorial Misconduct

■ "Allegations of prosecutorial misconduct are reviewed under the harmless beyond a reasonable doubt standard, which requires an examination of the record and a determination of whether there is a reasonable possibility that the error complained of might have contributed to the conviction." *State v. Rogan,* 91 Hawai'i 405, 412, 984 P.2d 1231, 1238 (1999) (internal quotation marks and citations omitted) (quoting *State v. Sawyer,* 88 Hawai'i 325, 329 n. 6, 966 P.2d 637, 641 n. 6 (1998)).

■ "Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff,* 76 Hawai'i 148, 158, 871 P.2d 782, 792 (1994). "In order to determine whether the alleged prosecutorial misconduct reached the level of reversible error, we consider the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant." *State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992).

## J. Substantial Evidence—Jury Trial

■ " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998) (citation omitted). Also, "[i]t is evidence which a reasonable

mind might accept as adequate to support such a conclusion." *State v. Naeole,* 62 Haw. 563, 565, 617 P.2d 820, 823 (1980). In reviewing whether substantial evidence exists to support a conviction, due deference must be given to the right of the trier of fact to "determine credibility, weigh the evidence, and draw justifiable inferences of fact from the evidence adduced[.]" *Id.* "Guilt may be proved beyond a reasonable doubt on the basis of reasonable inferences drawn from circumstantial evidence." *State v. Mitchell,* 88 Hawai'i 216, 226, 965 P.2d 149, 159 (1998) (quoting *State v. Pone,* 78 Hawai'i 262, 273, 892 P.2d 455, 466 (1995)).

## IV. DISCUSSION

### A. The circuit court did not abuse its discretion by partially granting HPD's motion to quash Mark's subpoenas for Internal Affairs Division records

■ Mark contends that the circuit court erred by partially granting HPD's motion to quash his subpoenas for Internal Affairs Division (IAD) records. The subpoenas called for the production of records of investigations of Officers Gaspar, Higa, Sung, Swann, Kato, Kawakami, Sheryl Sunia, and Clifford Rubio "[c]oncerning any allegations of untruthfulness, violence or failing to follow HPD rules and regulations." In response, HPD filed a motion to quash the subpoenas duces tecum, or in the alternative, for an in-camera inspection.

HPD subsequently submitted certain responsive documents to the circuit court. The circuit court reviewed the documents in camera, and issued a protective order granting in part and denying in part the motion to quash. The circuit court ordered that a total of 77 pages be disclosed to the State and defense counsel, and that those records be redacted to exclude the names of other officers involved in the investigations. The circuit court further ordered that the entire file provided by HPD be included in the record under seal, along with a copy of the 77 pages provided to counsel.

Mark argues that this court "should order further disclosure of any records that are material to the defense bearing in mind that

Mark has raised both self-defense and defense of others." After conducting our own in-camera review, we conclude the circuit court did not abuse its discretion by partially granting HPD's motion to quash the subpoena for the IAD records. *Estrada*, 69 Haw. at 216–17, 738 P.2d at 821–22. The documents which were not disclosed by the circuit court included material that was duplicative of the documents that were disclosed, that related to investigations of allegations that were determined to be unsubstantiated, or that did not materially relate to Mark's defenses or to the truthfulness of the officers. Thus, the circuit court did not err in quashing the subpoena as to those documents. *Cf. id.* (finding the trial court abused its discretion in declaring the entire IAD file not relevant where the file "display[ed] a pattern of [police] misconduct, lying, and abuse of police authority" which was relevant to a determination of who was the initial aggressor).

**B. The circuit court did not abuse its discretion in admitting the slow-motion and audio-enhanced videotape and did not err in refusing Mark's proposed instructions regarding the tape**

Mark argues that the circuit court erred in admitting a videotape which contained audio-enhanced and slow-motion versions of the footage taken by Kortz inside Baskin–Robbins,[8] and by refusing his proposed jury instructions regarding that videotape.

The videotape was prepared by Noel Herold, a consultant for the FBI. It contained several versions of Kortz's original footage. The first was in real time with enhanced audio which reduced background noise. The second was in real time with enhanced audio and a time display counter superimposed on the screen. The third and fourth versions were slowed down to 1/2 and 1/3 of real time, with no audio, but with a time display counter.[9]

---

8. The original videotape was admitted into evidence at trial as Exhibit 89 without objection.

9. Herold initially produced a videotape which also included 1/5 and 1/10 speed versions. How-

At trial, Herold testified about the process he had used to create the videotape, and that the various versions were "fair and accurate depictions of the actual images on the original tape[.]" The court admitted the exhibit over Mark's objection.

When the State published the exhibit, the circuit court instructed the jury as follows:

Ladies and gentlemen, you're about to see and hear State's Exhibit 108. Remember that you are—you, the jury—are the sole and exclusive judges of the effect and value ... of the evidence and of what words may be discernible on State's 108.

During the settling of jury instructions, the court refused the following instructions proposed by Mark:

*Defendant's Supplemental Proposed Instruction No. 1*

State's Exhibit 89 was shot in "real time". All other versions ... have visual and audio enhancements. [Those versions are] being offered for the limited purpose of _____. Such evidence must be considered only the issue of _____.

*Defendant's Supplemental Proposed Instruction [No.] 2*

You are about to hear and see a videotape taken at Baskin–Robins [sic] on March 4, 2003.

You will see different versions, some with audio, some without, some in "real time", some in slow motion. The slow-motion versions are being shown to you to assist you in viewing the "real time" version. Similarly, the versions without audio are shown to assist you in evaluating those with audio. You should not consider the versions in slow motion or without audio in and of themselves but only to assist you in viewing the real time audio versions.

As to the versions with audio, you should keep in mind that what you are hearing is what the camcorder microphone picked up and you should not assume that what you are hearing is what was necessarily heard by any person present at Baskin–Robins

---

ever, the court did not admit into evidence the 1/5 and 1/10 time versions on the ground that those versions would have been cumulative.

[sic] on March 4, 2003. You are the sole exclusive judges of the facts in this case and of the effect and value to be given to all evidence.

In closing argument, defense counsel argued that the videotape was distorted, and cautioned the jury not to be misled by the illusion that Mark "had forever to react." Defense counsel urged the jury to compare the slow-motion versions to the original footage to "see how fast things really happen."

■ On appeal, Mark argues that "the prejudicial effect of the slow-motion FBI enhanced videotape greatly outweighed any probative value."[10] Mark does not provide any argument on why the court erred in admitting the audio-enhanced versions on the videotape, and accordingly we deem any challenge to the audio enhancement to be waived and address only the slow-motion versions. Hawai'i Rules of Appellate Procedure (HRAP) Rule 28(b)(7).

■ The circuit court did not abuse its discretion in finding that the probative value of the 1/2 and 1/3 of real time speed versions was not substantially outweighed by any potential prejudice. Hawaii Rules of Evidence (HRE) Rule 403; see State v. Brewington, 343 N.C. 448, 471 S.E.2d 398, 403 (1996) (probative value of surveillance camera videotape of shooting in pawn shop which was played in slow motion for the jury was not outweighed by prejudicial effect where sequence of events was essential to the jury's determination of whether the defendant was guilty of first degree murder on a theory of premeditation); see also United States v. Begay, 42 F.3d 486, 503 (9th Cir.1994); cf. Commonwealth v. Hindi, 429 Pa.Super. 169, 631 A.2d 1341, 1345–46 (1993). The slow-motion versions were highly probative of the sequence of events when Mark was approached by the two officers in Baskin–Robbins, and were not cumulative because each provided a somewhat different perspective. They were not unduly prejudicial because there was sufficient foundation established as to their preparation, they contained a time counter indicating the speed at which they

were playing, and the jury could compare them to the original taken by Kortz.

■ The court also did not err in denying Mark's proposed instructions, which were largely duplicative of the instruction given by the court when the exhibit was published to the jury. It was not necessary for the court to repeat that instruction at the end of the case. Cf. State v. Perez, 64 Haw. 232, 235, 638 P.2d 335, 337 (1981). Moreover, Mark's proposed instruction to "keep in mind that what you are hearing is what the camcorder microphone picked up and you should not assume that what you are hearing is what was necessarily heard by any person present" was properly rejected since it constituted argument rather than a statement of the law. See State v. Sawyer, 88 Hawai'i 325, 330, 966 P.2d 637, 642 (1998).

## C. Mark was not denied a fair trial in the first trial

■ Mark suggests that there were "numerous errors" made in the first trial, relating to the (1) effect of publicity on the jury, (2) an incident in which some potential jurors saw Mark in the company of a sheriff, and (3) the DPA's questioning of certain witnesses. Mark argues that the cumulative weight of these alleged errors denied him a fair trial. Because we conclude that the individual instances of error alleged by Mark are without merit, we need not address their alleged cumulative effect. See State v. Samuel, 74 Haw. 141, 159, 838 P.2d 1374, 1383 (1992).

### 1. The circuit court did not abuse its discretion in denying Mark's motions to continue trial and motion for a mistrial based on publicity about the case

On October 2, 2003, Mark filed a motion seeking a continuance of the trial because this was a high-profile case involving possession of crystal methamphetamine, which had been "subject to intense media coverage," and because there had been a recent "community outcry against the use and sale of

---

10. Mark's arguments on appeal appear to be directed at the first trial. In the second trial, defense counsel stipulated to the admission of

the original and the 1/2 and 1/3 speed versions, and did not request a limiting instruction beyond that given by the court.

crystal methamphetamine, the media has focused coverage on [the drug], at times using [Mark] as an example in their presentations." Mark submitted copies of numerous newspaper articles that discussed Mark's case specifically, or problems associated with methamphetamine in general, including six articles that referred to Mark's prior criminal record, ice use, or release from incarceration that were published in the days immediately following the Baskin–Robbins incident. Mark also submitted a copy of a television documentary concerning methamphetamine in Hawai'i that aired in September 2003 and referred to the shooting at the Baskin–Robbins.[11]

The circuit court denied the motion without prejudice and voir dire began on November 13, 2003. The court instructed the potential jurors to "be very careful not to read, listen to, [or] watch any media reports regarding any aspect of this case." The court individually questioned potential jurors about the extent and recency of their exposure to pretrial publicity, discussions they had with others about the case, opinions and impressions they developed as a result of exposure to media, and whether they could decide the case on the evidence presented and the law as instructed by the court. The circuit court excused many jurors who stated that they could not be fair and impartial as a result of their exposure to media accounts of the case, but kept others who stated that exposure to pretrial publicity would not affect them.

On November 14, 2003, Mark renewed his motion for a continuance because (1) a newspaper article that morning stated in its last paragraph that "[d]uring a pretrial hearing, [the DPA] said the prosecution will contend that Mark traded crystal meth for the gun that was used to kill Gaspar[,]" and (2) many

of the potential jurors had stated the previous day that they were aware of the case. The circuit court denied the motion without prejudice, and resumed voir dire of the potential jurors.

It appears that a second venire was impaneled on November 18, 2003.[12] The circuit court identified those jurors who had not been exposed to any media coverage about the case, and directed them to return in two days for final voir dire and jury selection. Before excusing those jurors, the court admonished them not to discuss the case with anyone, read, listen to, or watch any media reports, or investigate the case because they must "base their decisions only and solely upon the evidence ... brought forth at trial[.]" The circuit court and parties then questioned the remaining jurors regarding whether they could be fair and impartial in spite of their exposure to pretrial publicity.

Prior to opening statements on December 3, 2003, Mark moved for a mistrial. Defense counsel asserted that a newspaper article published that morning discussed a suppressed blood test and "impl[ied] that there were drugs there," and also discussed a statement made by the prosecutor prior to trial that Mark had allegedly traded drugs for the gun used in the Baskin–Robbins incident. The circuit court denied the motion. After swearing in the jury, the court asked, "Since we last saw one another, has anyone seen, heard, or read any news media accounts relating to any aspect of this case[?]" There was no response from the jury.

On December 4, 2003, the court questioned the jury about a newspaper article published and radio program aired that morning. None of the jurors indicated that they were aware of that coverage, and the court in-

11. The documentary included footage of Officer Gaspar being taken from the scene on a stretcher, Mark in police custody, and excerpts of a 911 tape. Mark was not identified by name, although the narrator indicated that the suspect may have had eight drugs in his system at the time of the shooting.

12. On November 18, 2003, the court reintroduced the case, the parties, and counsel, swore in a jury pool, and began voir dire as it had on November 13, 2003, the first day of jury selection. On November 20, 2003, the court random-

ly selected jurors for a final voir dire from a total of 76 jurors who had been retained from the first and second venires. A jury was selected on November 21, 2003. Before excusing the jury, the circuit court instructed the jury not to discuss the case with anyone, investigate the case on their own, read any newspaper articles on the case, or listen to any radio or TV broadcast about the case. The circuit court also instructed the jury to return on December 3, 2003 for the start of trial.

structed the jurors that they should advise the court immediately if anything came to their attention that could affect their ability to be fair.

The following morning the court again asked the jury if anyone had been exposed to media coverage, and there was no response. The court similarly questioned the jury on December 11, 2003. In addition, at the end of each day of trial, the court admonished the jury not to read or listen to any media accounts of the case, and to "keep an open mind."

The circuit court did not abuse its discretion in denying Mark's motions for a continuance. In *State v. Pauline*, 100 Hawai'i 356, 365–66, 60 P.3d 306, 315–16 (2002), the Hawai'i Supreme Court considered whether the trial court had properly denied a motion for change of venue based on pretrial publicity about a highly publicized murder case, and concluded that it had not erred. The supreme court noted that "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Id.* at 366, 60 P.3d at 316 (internal quotation marks and citation omitted). This is because "if the mere opportunity for prejudice or corruption is to raise a presumption that they exist, it will be hard to maintain a jury trial under the conditions of the present day." *Id.* (internal quotation marks, citation, and brackets omitted); *see State v. Graham*, 70 Haw. 627, 637, 780 P.2d 1103, 1109–10 (1989).

 The court observed that "we have been hesitant to presume prejudice[,]" and that prejudice will be presumed "only in 'extreme situations.'" *Pauline*, 100 Hawai'i at 366, 60 P.3d at 316. In determining whether publicity has rendered a trial presumptively unfair, a court must consider the "amount and timing" of media accounts, *id.* at 367, 60 P.3d at 317, "whether the media accounts were primarily factual," and "whether the media accounts contained inflammatory, prejudicial information that was not admissible at trial." *Id.* at 366, 60 P.3d at 316 (citation omitted). Additionally, when reviewing that determination on appeal, the appellate court considers the thoroughness of the voir dire as well as the results of that

questioning in determining whether presumptive prejudice existed. *Id.* at 367–68, 60 P.3d at 317–18.

 Applying those principles here, we conclude that the circuit court did not abuse its discretion in denying the motions to continue. Although there was substantial media coverage about the case, the media accounts were primarily factual, rather than "passing judgment" or "denouncing and demonizing" Mark. *Id.* at 367, 60 P.3d at 317. While some of the reports included references to inadmissible matters such as Mark's criminal record and alleged ice use, the record does not establish that "there was a barrage of inflammatory publicity immediately prior to trial amounting to a huge … wave of public passion[,]" *id.* at 366, 60 P.3d at 316 (citation omitted), which resulted in "a trial atmosphere that had been utterly corrupted by press coverage," *Graham*, 70 Haw. at 637, 780 P.2d at 1109 (citation omitted).

Additionally, the record of the voir dire confirms that this was not a case in which prejudice should be presumed. The circuit court and the parties examined potential jurors individually about their knowledge of the case, and inquired specifically into the basis and nature of that knowledge. For example, potential jurors who indicated that they were aware of Mark's alleged involvement with drugs were asked follow up questions about that knowledge. The court's thorough voir dire protected Mark from the effects of publicity about the case, and established an "objective" record concerning the effect of publicity on potential jurors. *Pauline*, 100 Hawai'i at 368, 60 P.3d at 318. That record demonstrates that although many potential jurors knew about the case, the circuit court was able to identify and excuse those jurors whose ability to be fair and impartial had been affected.

 Nor did the circuit court abuse its discretion in denying Mark's December 3, 2003 motion for a mistrial based on a newspaper article that appeared that morning. *See Lagat*, 97 Hawai'i at 495, 40 P.3d at 897. The circuit court asked that morning if any of the jurors had been exposed to any media

accounts about the case, and none indicated that they had.

In sum, the court's thorough voir dire of potential jurors, together with its repeated instructions to the jurors about avoiding exposure to media coverage and its questions to the jury confirming that they had not been exposed to such coverage as the case progressed, adequately protected Mark from the potentially prejudicial effects of the extensive publicity that this case received. Thus, the court did not abuse its discretion in denying Mark's motions for a continuance and a mistrial.

### 2. The circuit court did not err in declining to excuse the entire pool of potential jurors after Mark was escorted into the courtroom by a sheriff

■ On November 13, 2003, defense counsel moved to dismiss the entire jury panel before voir dire began because of an incident that occurred that morning. Mark had entered the room being used for jury selection followed by a sheriff, while potential jurors were present. Mark, who was dressed in civilian clothes and was not shackled or handcuffed, sat down at the defense table while the sheriff stood "a couple of feet" behind him. When informed of the incident, the circuit court expressed concern that the prospective jurors may have inferred that Mark was in custody and was accordingly dangerous. However, the court decided to individually voir dire the jurors on their observations of Mark rather than to release the entire pool. Although the court excused most of the jurors who stated that they observed Mark with the sheriff, it did retain some jurors who said they could be fair and impartial despite their observations. Mark did not object to the retention of those jurors.

Mark argues that the "entire jury panel was tainted[,]" and "[n]o amount of voir dire can cure that kind of prejudice." However, given the circumstances of the incident, we conclude that the circuit court did not err in declining to excuse the entire panel. The court was able, through its voir dire, to identify and excuse those potential jurors who were affected by their observations. *Cf. State v. Reverio,* 61 Haw. 95, 96–97, 595 P.2d 1069, 1070–71 (1979) (circuit court erred by dismissing indictment after the venire briefly saw defendant escorted into the courtroom in shackles; court should have voir dired the jurors to determine if their observation had resulted in any prejudice, rather than dismissing the indictment); *see also State v. Samonte,* 83 Hawai'i 507, 524–27, 928 P.2d 1, 18–21 (1996).

### 3. Mark was not prejudiced by the questioning of Torres and Mark

■ Mark argues that the DPA committed misconduct by improperly questioning Torres and Mark. Specifically, Mark argues that the DPA improperly questioned Torres about why he had not reported Mark to the police, including during a period of time when Torres was in custody. Mark also argues that the DPA improperly cross-examined him about (1) whether he had traded something to Nakahara for the gun, (2) whether he went to the church parking lot to "rip off" Piko and Paikai, and (3) how he knew that Piko's father was imprisoned at Halawa. Although he concedes that "the court sustained most of the defense's objections and motions to strike," he argues that "the cumulative effect on the jury cannot be ignored."

Based on our review of the record, we conclude that there is no basis for requiring a new trial based on the questions asked by the DPA. The DPA appeared to have a good faith basis for asking the challenged questions as part of cross-examination. Although some of the questions could be interpreted as suggesting an improper inference, and the objections were sustained on that ground, those questions were ambiguous and thus did not prejudice Mark, *see Ladd v. State,* 3 S.W.3d 547, 566–67 (Tex.Crim.App.1999), particularly given the court's prompt curative measures.[13] Moreover, the court instructed

---

**13.** For example, after Mark testified that he knew Piko's father was in prison in Halawa, the DPA asked if Mark knew that "because you saw him there." Mark answered "no," and the court struck the question and Mark's answer. Although the question could be interpreted as sug-

the jury at the end of the case that "[s]tate-ments or remarks made by counsel are not evidence." *See State v. Tunoa,* 113 Hawai'i 393, 400, 153 P.3d 464, 472 (App.2007).

### 4. The DPA's questioning of Lt. Kato and Officer Sung was proper

 Mark lastly suggests that the DPA committed misconduct in eliciting prejudicial testimony from Lt. Kato and Officer Sung. Prior to trial, Mark moved to exclude evidence relating to his prior criminal record, and the State agreed that such evidence was not relevant. At trial, the DPA questioned Lt. Kato about how the officers planned to arrest Mark, asking, "What do you and [Det. Swann] decide to do to carry out the plan?" Lt. Kato answered that Det. Swann told him that "they would continue to get more intelligence on—on [Mark's] arrest record and things along this line[.]" The court sustained Mark's motion to strike the answer, and instructed the jury to "disregard it completely" and not to "believe that the defendant is a ... bad person and, hence, must have committed any of the offenses in this case." Mark later moved for a mistrial, but the circuit court denied the motion, noting that the DPA "asked a general question" and it was not "sufficiently clear that [the DPA] was deliberately trying to elicit testimony about any existence of an arrest record."

We agree with the circuit court that the circumstances of the question do not suggest a deliberate effort by the DPA to circumvent the motion in limine. Moreover, Lt. Kato's answer was ambiguous and did not clearly indicate that Mark in fact had prior arrests, and the court promptly instructed the jury to ignore it. Thus, there was no misconduct, and Mark did not suffer any prejudice.

 Also prior to trial, the circuit court granted Mark's motion to preclude "the presentation of testimony by HPD officers or others as to their grief and/or their opinions of the deceased or defendant, including any showing of emotion by professional law enforcement personnel."

During direct examination of Officer Sung, the DPA asked what he did after he hand-cuffed Mark and took him out of the Baskin-Robbins. Officer Sung stated he went over to Officer Gaspar who was laying motionless on the ground, and started "trying to shake his upper part of the body, ... calling out his name couple times, 'Glen, Glen,' and then he wasn't moving, he wasn't responding at all, and then I was yelling out ... call 911 and get the ambulance[.]" The other officers rushed in and pulled Officer Sung away from the scene.

Defense counsel moved for a mistrial. The circuit court denied the motion, noting that "no officers have ... shown any emotion[,]" and "[t]his witness has shown no emotion except for that one answer where his voice did break slightly. There were no tears, there was no real hesitation, it's not as if he couldn't talk."

We agree with the circuit court's assessment. The DPA's question appeared to be calculated to have Officer Sung explain the sequence of events inside the Baskin-Robbins rather than to elicit a prejudicially emotional response. Moreover, the record indicates that Officer Sung and the other witnesses for the State did not testify in a manner that unduly injected prejudicial emotion into the case.

### D. Jury instructions on defense of others

In the first trial, the circuit court instructed the jury on the justification of defense of others with regard to Counts I–IV of *Mark I,* and Counts I–III of *Mark II.* The instructions were similar to each other, with some exceptions that are not relevant to this appeal.[14] For example, the court gave the fol-

---

gesting that Mark may have been in Halawa himself, it could also be interpreted as suggesting that Mark was simply speculating. Thus, while the court properly sustained Mark's objection and struck the question and response, we cannot say that the asking of the question constituted misconduct or that it prejudiced Mark.

14. The instructions in *Mark II* contained a final paragraph relating to the use of force upon a person whom the defendant knows is a police officer, which was omitted in the *Mark I* instructions. The instructions on Counts I and II of *Mark II* also included a paragraph relating to the unavailability of the defense if the defendant was reckless in determining that his use of force

lowing instruction with respect to the first degree murder charge concerning Officer Gaspar [15]:

■ In Count 1 of [*Mark II*], if you unanimously find that the prosecution has proven beyond a reasonable doubt all of the material elements of Murder in the First Degree, or of the included offense of Murder in the Second Degree, or of the included offense of Manslaughter based upon reckless conduct, then you must consider whether the force used by Defendant was justifiable based upon use of force in defense of another person.

■ Justifiable use of force or deadly force in defense of another person is a defense to the offenses of Murder in the First Degree, Murder in the Second Degree, and Manslaughter based upon reckless conduct. The burden is on the prosecution to prove beyond a reasonable doubt that the force used by the Defendant was not justifiable based upon use of force in defense of another person. If you unanimously find that the prosecution has not met its burden, then you must find the Defendant not guilty as to Count 1 of [*Mark II*]. If you are not unanimous as to whether the prosecution has met its burden, then a verdict cannot be returned as to Count 1 of [*Mark II*].

■ The use of force upon or toward another person is justified to protect a third person when:

1. Under the circumstances as the Defendant reasonably believed them to be, the third person would have been justified in using such force to protect himself or herself; and

2. The Defendant reasonably believed that his intervention was immediately necessary to protect the third person.

■ The reasonableness of the Defendant's belief that the use of such protective force was immediately necessary shall be determined from the viewpoint of a reasonable person in the Defendant's position under the circumstances of which the De-

fendant was aware or as the Defendant reasonably believed them to be.

■ The third person would have been justified in using force upon or toward Glen[n] Gaspar if he or she reasonably believed that such force was immediately necessary to protect himself or herself on the present occasion against the use of unlawful force by Glen[n] Gaspar.

■ The third person would have been justified in using deadly force upon or toward Glen[n] Gaspar if he or she reasonably believed that deadly force was immediately necessary to protect himself or herself on the present occasion against death, serious bodily injury, or kidnapping.

■ The use of deadly force is not justifiable if the Defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter, or if the Defendant knows that he can avoid the necessity of using such force with complete safety by retreating.

■ If and only if you find that the Defendant was reckless in having a belief that he was justified in using force in defense of another person, or that the Defendant was reckless in acquiring or failing to acquire any knowledge or belief which was material to the justifiability of his use of force against another person, then the use of such protective force is unavailable as a defense to Manslaughter based upon reckless conduct.

■ The use of force is not justifiable to resist an arrest that the Defendant knows is being made by a police officer, even if the arrest is unlawful. On the other hand, if the police officer threatens to use or uses unlawful force, the law regarding use of protective force would apply.

Mark did not object to any of these instructions. The State did, however, object to the instructions given in *Mark II,* and argued that there wasn't any evidence that Officers Gaspar and Sung used force or threatened to use force against anyone in the Baskin–Robbins except Mark. In response,

---

against a third person was necessary, which was omitted in all other instructions.

**15.** We have numbered the paragraphs of the instruction for ease of reference.

the court observed that Mark had testified that he was fearful for Daughter. Mark's counsel then argued that Daughter would have been justified to use force if the struggling men were falling into her, or to push them away if they attacked her, but conceded that Daughter would not have the right to use deadly force as it is "a greater degree of force than is justified." The court gave the instructions over the State's objection.

Mark now argues that the instructions were insufficient, confusing, and misleading. Although Mark did not object to the instructions at trial, we nevertheless review them to determine whether they were erroneous, and if so, whether the error was harmless beyond a reasonable doubt. *Nichols*, 111 Hawai'i at 337, 141 P.3d at 984.

Mark contends that the instructions were erroneous because (1) they improperly shifted the jury's focus from whether Mark "reasonably believed that the third person was justified in using deadly force" to whether Daughter or Martin were justified in using deadly force, (2) "the court erroneously used the same duty to retreat as for self-defense[,]" and (3) "H.R.S. Sec. 703–305 does not contain any condition that the defendant did not provoke the use of force against himself."

■■■ The court's instructions were in substance identical to Hawai'i Standard Jury Instruction, Criminal (HAWJIC) No. 7.02 (Defense of Others) (1991). Although HAWJIC instructions are not binding on the Hawai'i appellate courts, *State v. Nupeiset*, 90 Hawai'i 175, 181–82 n. 9, 977 P.2d 183, 189–90 n. 9 (App.1999), our supreme court has observed that HAWJIC 7.02 on defense of others and 7.01 on self-defense "come right out of the Hawai'i Penal Code and [*State v.] Pemberton*, [71 Haw. 466, 796 P.2d 80 (1990)] and cover all possible conditions under which a defendant can prevail with respect to his or her use-of-force defense[,]"

*State v. Augustin*, 101 Hawai'i 127, 128, 63 P.3d 1097, 1098 (2002).

■■■ Turning to Mark's first contention, it is well-settled that "[w]hen jury instructions or the omission thereof are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent or misleading." *Gonsalves*, 108 Hawai'i at 292, 119 P.3d at 600 (internal quotation marks and citation omitted). Mark suggests that paragraphs 5 and 6 of the instruction, which discuss the circumstances under which the third person would have been justified in using force and deadly force, respectively, improperly focused the jury on whether Martin or Daughter would in fact have been justified in using force or deadly force, rather than on Mark's reasonable belief as to whether they were so justified. However, Mark ignores paragraph 3 of the instruction, which makes clear that the jury must evaluate the issue "[u]nder the circumstances as the Defendant reasonably believed them to be," and paragraph 4, which further discusses how to assess the reasonableness of the defendant's belief.

Viewed in the context of the entire instruction,[16] paragraphs 5 and 6 did not improperly suggest that the jury should decide whether the third party was in fact justified in using force or deadly force. Rather, they provided the jury with the underlying principles to evaluate the reasonableness of the defendant's belief that the third party would be so justified. Thus, Mark's first argument is without merit.

Mark's next argument, concerning the defendant's duty to retreat or comply, requires us to evaluate HRS § 703–305, which establishes the defense of others justification, and § 703–304, which establishes the self-defense justification. HRS § 703–305 provides in pertinent part as follows:

**Use of force for the protection of other persons.** (1) Subject to the provisions

---

16. We note that the circuit court directed the jury to consider the instructions in context by giving the following instruction in both trials:

You must consider all of the instructions as a whole and consider each instruction in the light of all of the others. Do not single out any word, phrase, sentence, or instruction and ignore the others. Do not give greater emphasis to any word, phrase, sentence or instruction simply because it is repeated in these instructions.

of this section and of section 703–310, the use of force upon or toward the person of another is justifiable to protect a third person when:

(a) Under the circumstances as the actor believes them to be, the person whom the actor seeks to protect would be justified in using such protective force; and

(b) The actor believes that the actor's intervention is necessary for the protection of the other person.

(2) Notwithstanding subsection (1):

(a) When the actor would be obliged under section 703–304 to retreat, to surrender the possession of a thing, or to comply with a demand before using force in self-protection, the actor is not obliged to do so before using force for the protection of another person, unless the actor knows that the actor can thereby secure the complete safety of such other person; and

(b) When the person whom the actor seeks to protect would be obliged under section 703–304 to retreat, to surrender the possession of a thing or to comply with a demand if the person knew that the person could obtain complete safety by so doing, the actor is obliged to try to cause the person to do so before using force in the person's protection if the actor knows that the actor can obtain the other's complete safety in that way[.]

HRS § 703–304 provides in relevant part:

**Use of force in self-protection.** (1) Subject to the provisions of this section and of section 703–308, the use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

(2) The use of deadly force is justifiable under this section if the actor believes that deadly force is necessary to protect himself against death, serious bodily injury, kidnapping, rape, or forcible sodomy.

(3) Except as otherwise provided in subsections (4) and (5) of this section, a person employing protective force may estimate the necessity thereof under the circumstances as he believes them to be when the force is used without retreating, surrendering possession, doing any other act which he has no legal duty to do, or abstaining from any lawful action.

(4) The use of force is not justifiable under this section:

(a) To resist an arrest which the actor knows is being made by a law enforcement officer, although the arrest is unlawful; ...

....

(5) The use of deadly force is not justifiable under this section if:

(a) The actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or

(b) The actor knows that he can avoid the necessity of using such force with complete safety by retreating or by surrendering possession of a thing to a person asserting a claim of right thereto or by complying with a demand that he abstain from any action which he has no duty to take[.]

Mark claims that several aspects of the circuit court's instruction did not accurately reflect the provisions of section 703–305. First, he observes that the provisions of section 703–305(2)(b), which address the defendant's obligation to attempt to cause the third party to retreat before the defendant uses force, are nowhere discussed in the instruction. Second, he contends that the provisions of section 703–305(2)(a), which address the defendant's obligation to retreat, surrender possession, or comply with demands, are not accurately reflected in the instruction. Finally, he observes that the concept of provocation by the defendant, which is discussed in paragraph 7 of the instruction, is not explicitly addressed in section 703–305. We discuss these contentions in turn.

Mark is correct in observing that the provisions of section 703–305(2)(b) are not

included in the court's instruction. However, that omission did not harm Mark. Section 703–305(2)(b) provides that the justification is *not* available to a defendant who fails to try to cause the third party to retreat under certain conditions. By not instructing the jury with regard to that qualification on the use of force, the circuit court effectively gave Mark the benefit of the justification even if he would otherwise not be entitled to rely on it under section 703–305(2)(b). Thus, the court's failure to instruct the jury with regard to that section was harmless beyond a reasonable doubt. *Nupeiset*, 90 Hawai'i at 185, 977 P.2d at 193 ("The deletion of this qualification set a lower standard of justification for Defendant's use of force than that permitted under HRS §§ 703–304 and –305, and thus, could not have prejudiced Defendant.").

■ Second, Mark contends that the court's instruction inaccurately summarizes section 703–305(2)(a)'s provisions with regard to the defendant's duty to retreat "unless the actor knows that the actor can thereby secure the complete safety of such other person." [17] Paragraph 7 of the instruction provided that the use of deadly force is not justifiable "if Defendant knows that he can avoid the necessity of using such force with complete safety by retreating." Mark argues that the instruction misstated the law by asking the jury to determine whether Mark could retreat with complete safety to himself, rather than whether he could retreat with complete safety to Daughter or Martin.

We disagree with Mark's interpretation of the instruction. Read in context of the entire instruction, the "necessity" for using force in paragraph 7 refers to the threat to the third party, and the instruction thus advises the jury that the defendant must retreat only if he or she can avoid "the necessity of such force with complete safety" of that third party.[18] Put another way, under

Mark's interpretation, anyone who observes an innocent person about to be killed would be obliged to retreat as long as he or she could save himself or herself in the process. That is not a natural reading of the language of paragraph 7 when viewed in context of the rest of the instruction.

■ Even if we were to find that the instruction was a potentially misleading statement of the law, the error would be harmless beyond a reasonable doubt. With regard to the incident at the Baskin–Robbins, the evidence established that Mark was in the grasp of several police officers when he fired his handgun, and that he was in effect cornered in the back of the store. This evidence foreclosed the possibility that Mark could have retreated in any event. *Nupeiset*, 90 Hawai'i at 184, 977 P.2d at 192.

Moreover, we note that the jury was also instructed on self-defense with regard to the counts at issue here, and necessarily rejected that defense in finding Mark guilty. Given the evidence at trial, it is not reasonably possible that a jury would find that Mark lacked justification to use deadly force to protect himself, but would find that he was justified in using it to protect Daughter and Martin (at the Baskin–Robbins) or Martin (at the church parking lot).

Indeed, as we noted above, defense counsel conceded that the use of *deadly* force by Daughter at the Baskin–Robbins would have been excessive, a conclusion with which we concur. There is nothing in the record to suggest that Mark could have reasonably believed to the contrary. HRS § 703–300 (1993) ("'Believes' means reasonably believes."); *Pemberton*, 71 Haw. at 477, 796 P.2d at 85 ("the standard for judging the reasonableness of a defendant's belief for the need to use deadly force is determined from the point of view of a reasonable person in the Defendant's position *under the circum-*

---

**17.** Mark does not contend that the instruction's omission of references to the duty to surrender possession or to comply with a demand, both of which are described in HRS § 703–305(2)(a), was error, so we do not address that issue here.

**18.** To the extent that there is a "necessity" for a *defendant to use force to protect himself or her-*

self as opposed to the third party, the applicable legal principles are set forth in HRS § 703–304. That distinction was reflected in the instructions given here, which contained separate instructions for each applicable count for self-defense and for defense of others.

*stances as he believed them to be ")*. Nor is there anything in the record to indicate that Mark could have reasonably believed that there was a threat to Martin at the Baskin–Robbins that would have justified the use of deadly force by her.[19]

■ Finally, with regard to the incident at the church parking lot, the evidence did not establish that Martin, who was inside the car at the time of the confrontation between Mark and Piko, had been subject to any imminent harm or threat of harm by Piko or Paikai or would have been justified in using deadly force to protect herself in response to what was taking place outside of the car. Although Mark testified that he was afraid that Martin might get out of the car and try to intervene in the dispute between himself and Piko, that possibility was speculative and would not support a reasonable belief on Mark's part that Martin was justified in using deadly force against Piko, let alone Paikai.

Lastly, we turn to Mark's challenge to the first part of paragraph 7 of the instruction, which provided that the use of deadly force is not justified "if the Defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter[.]" Mark argues that this language does not appear in HRS § 703–305, and that accordingly, it is an inaccurate statement of the law. The State responds that the instruction was appropriate since that language appears in section 703–304 with regard to the defense of others, and that the commentary to section 703–305 reflects an intent to extend "the defense of justification to include the use of physical force to protect another person on the same terms as the defense is available for the use of force in self protection."

■ We agree with Mark that this part of the instruction does appear to mix princi-

ples of self-defense with those of defense of others in a way that could be confusing to a jury. The instruction refers to a defendant who provokes the use of deadly force against himself. However, in such a scenario, the principles set forth in section 703–304 should govern, and the fact that the defendant had provoked the use of deadly force against himself would not, without more,[20] be relevant to determining the defendant's right to use deadly force to protect a third person.

■ However, we conclude that the instruction was harmless beyond a reasonable doubt. There is nothing in the record to suggest that Mark, with the intent of causing death or serious bodily injury, did anything in the Baskin–Robbins to provoke the use of force against himself. This forecloses the possibility that the jury would have denied the defense of others justification to Mark based on the erroneous part of the instruction. *Cf. Nupeiset,* 90 Hawai'i at 184, 977 P.2d at 192. Nor does the evidence suggest that Mark did anything in the church parking lot, with the intent of causing death or serious bodily injury, to provoke the use of force against him.

In sum, we reject Mark's challenge to the defense of others instructions in the first trial.

Mark also challenges the defense of others instructions given by the circuit court in the second trial. However, only one of those instructions, which related to the first degree attempted murder charge for Officer Sung and the lesser included offenses of that charge, resulted in a conviction. Accordingly, we limit our discussion to that instruction, which was in substance identical to those given in the first trial, with one significant exception. The sentence in paragraph 7 of the original instruction, which discussed the defendant's duty to retreat, was deleted. That sentence was replaced by the following

19. Although Mark testified that Martin was present in Baskin–Robbins, he did not testify that he was concerned about her safety during the incident.

20. There are several possible scenarios which we do not address here because they are not presented by the facts of this case. Thus, we do not address whether provocative acts by a defendant that result in a threat to a third party would disqualify the defendant from relying on the justification under section 703–305. Nor do we address whether provocative acts by the third party could disqualify the defendant from relying on the justification. *Cf. Nupeiset,* 90 Hawai'i at 182, 183 n. 11, 977 P.2d at 190, 191 n. 11.

new paragraphs, which directly track the language of HRS § 703–305(2)(a) and (b), respectively:

The use of deadly force is not justifiable if the defendant, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter.

When, under the law of . . . justification based upon self-defense, the defendant would be obliged to retreat or comply with a demand before using deadly force, he is not obliged to do so before using deadly force to protect another person unless he knows that he can thereby secure the complete safety of the third person.

There is nothing in the record to indicate why the circuit court made that modification. Mark did not object to the modified instruction. The State objected to the instruction on the grounds that there was "not even a scintilla of evidence that a third person in Baskin & Robbins would've been justified in using any force whatsoever toward anyone."

Mark appears to concede that this modified instruction resolves his objection to the language regarding the duty to retreat in paragraph 7 of the instructions given in the first trial. We agree that the modified language accurately states the requirements of the law.

However, Mark contends that the instruction still improperly focused the jury's attention on whether Daughter and/or Martin were entitled to use force in self-defense, rather than on Mark's reasonable belief as to that issue. However, we reject that argument for the same reasons set forth above.

Mark also asserts that the first of the two new paragraphs cited above continued to misstate the law regarding provocation by the defendant. While we agree with Mark on that point, we nevertheless conclude that the error was harmless beyond a reasonable doubt. The jury was instructed with regard to self-defense in the second trial, and implicitly rejected that defense by convicting Mark of the attempted first degree assault of

Officer Sung. Although there were some differences in the evidence between the two trials,[21] nevertheless there was no evidence establishing that Mark reasonably believed that Martin or Daughter would have been justified in using deadly force to protect themselves inside the Baskin–Robbins.

Accordingly, we reject Mark's challenge to the defense of others instruction in the second trial.

## E. The circuit court did not err in its response to Jury Communication No. 8

Mark next argues that "the trial court erred in its response to jury communication No. 8 in the first trial." During its deliberations, the jury asked "if you find someone guilty of manslaughter, are you denying that the defendant intended or knew that his action could cause the victim's death?" Mark proposed that the court respond with two instructions, one defining reckless manslaughter, and one defining manslaughter based on extreme mental or emotional distress. The court responded by referring the jury back to the instructions given at trial.

On appeal, Mark concedes that the jury was provided with instructions on both reckless manslaughter and extreme mental and emotional distress manslaughter as part of the court's original instructions at trial. He argues that the jury was provided with a "set of instructions [that] was voluminous[,]" and the court "should have taken the trouble to distinguish between the two for the sake of the jury's full understanding of the distinction between the two types of manslaughter."

The circuit court did not err in refusing Mark's proposed response, and referring the jury back to the court's original instructions. Because the instructions given by the circuit court adequately covered the same propositions of law included in Mark's requested response, Mark's requested response was properly refused. *State v. Bush*, 58 Haw. 340, 342, 569 P.2d 349, 350 (1977). Although the court's original instructions were lengthy,

---

**21.** For example, in the second trial, Mark testified that he was "scared" for Martin during the course of the incident in the Baskin–Robbins; he did not testify to that effect during the first trial. However, we do not believe that these differences change the analysis.

they were not "prejudicially insufficient, erroneous, inconsistent, or misleading." *Gonsalves,* 108 Hawai'i at 292, 119 P.3d at 600 (citation omitted). Therefore, the circuit court did not err.

## F. Motion for mistrial and withdrawal of counsel regarding the representation of Piko by the OPD in the second trial

The jury returned its verdict in the first trial on December 22, 2003, and jury selection in the second trial commenced on June 29, 2004.

On July 14, 2004, during the State's case-in-chief, counsel and the court had a discussion outside the presence of the jury regarding potential witnesses. Defense counsel, Deputy Public Defender (DPD) Debra Loy, represented to the court that she had been informed that Piko was in custody, and asked for an offer of proof from the State regarding the reason for his incarceration. DPA Chris Van Marter responded that he was surprised that DPD Loy was unaware of Piko's incarceration, since another DPD, Jason Burks, had represented Piko "just a couple of months ago" in connection with a probation revocation proceeding that had resulted in Piko being "in there doing his one year as part of his five year term of probation." DPD Loy said that she had been unaware of that prior representation of Piko, and argued that if Piko was "on probation and we're still representing him, we have a mistrial problem, and we cannot cross-examine him." DPD Loy orally moved for a mistrial, which the circuit court took under advisement.

On July 20, 2004, defense counsel filed Defendant's Motion for Mistrial and Motion to Withdraw as Counsel and to Appoint Other Counsel. In a declaration in support of that motion, DPD Loy stated that (1) the OPD represented Piko in 2001 and 2002 on a forgery and drug charge, and Piko was sentenced to probation; (2) DPD Loy and her co-defense counsel DPD Teresa Marshall were unaware of this representation during Mark's first trial in November and December 2003; (3) in April 2004, another DPD represented Piko at a probation revocation hearing relating to the forgery charge; (4) DPDs Loy and Marshall did not learn of this representation until July 14, 2004, after the start of the second trial; (5) after consultation with temporarily appointed independent counsel, neither Mark nor Piko were willing to waive any conflict of interest arising out of the dual representation; (6) in order to represent Mark, defense counsel would have to cross-examine Piko as to the forgery offense and other bad acts; and (7) the Office of Disciplinary Counsel gave an informal opinion that "the Office of the Public Defender had a conflict of interest, and must move for a mistrial and move to withdraw from representing Shane Mark."

A hearing was held on the motion that day. Acting Chief DPD Timothy Ho (Ho) testified that he was one of the persons in the office responsible for determining whether the OPD has a conflict of interest in a case, and whether the conflict requires the office to withdraw from representing a party. DPD Ho testified that if the OPD was concurrently representing two defendants in a case, or concurrently representing a complaining witness and a defendant in a case, "it would definitely result in a withdrawal[.]" However,

> If there is a prior representation and the prior representation case is closed, if the file is closed, the person has been resentenced, then, we do a case by case analysis . . . as to whether or not there are adverse interests to be raised and . . . the recency of our representation of that prior client.

DPD Ho testified that DPD Richard Sing had represented Piko in connection with the original sentence in Piko's case, and that DPD Sing had left the office in April 2003. It was DPD Ho's understanding that those proceedings were completed when Mark's case first came to the OPD in March 2003. DPD Burks was assigned to work on Piko's probation revocation in February 2004, and appeared on behalf of Piko at a revocation hearing on April 14, 2004.

DPD Ho testified that in his opinion, the OPD's representation of Piko and Mark was concurrent because while the office "was active with Mr. Mark's case, Mr. Piko came back on a probation revocation and then [the office] represented both defendants at the same time." However, DPD Ho acknowl-

edged that there were no pending proceedings against Piko at the time of the July 20, 2004 hearing, that the facts and occurrences of the charges against Piko were unrelated to the charges against Mark, and that Piko and Mark were represented by different DPDs during their respective cases.

DPD Ho testified that OPD considers a case to be closed once a defendant is sentenced to probation. Attorneys in the OPD are expected to close case files "[w]hen the attorney is finished the court representation [sic] the person is sentenced to probation and there are no further proof of compliance hearings, no further court appearances scheduled[.]" Attorneys are expected to fill out a closing sheet, and then send the file to a storage area.

When the OPD learned of the potential conflict on July 14, 2004, Piko's file had been closed and was located in the file room where closed files are kept. It was reopened at that time in order to consider the issue of whether a conflict of interest existed.

DPD Ho testified that clients very rarely contact the OPD after their cases are closed, and usually only for the purposes of informing the office that "an order is wrong and . . . they want it corrected." DPD Ho did not see any indication in Piko's file that Adult Probation Services had contacted the OPD on his behalf.

DPD Ho was not aware of what specific measures had been taken by the OPD to screen for conflicts when the Mark case first was referred to the office in March 2003. He confirmed that it was his understanding that DPD Loy had no knowledge of the existence of Piko's file prior to July 14, 2004, and that DPD Loy had not gained any confidential information regarding Piko. Neither DPD Marshall nor Loy had any access to Piko's file since they became aware of it. Piko's file was currently in DPD Ho's office, and Ho would not allow DPDs Loy and Marshall to access the file if so ordered by the court.

DPD Ho testified that public defenders all have access to the closed file room, that they brainstorm with each other about their respective cases, and that there is "free sharing

of information" within the office as if the office were one firm.

After DPD Ho testified, temporary special counsel for Piko and Mark testified that neither Piko nor Mark would waive any conflict. Piko also testified that he would not waive any conflict of interest. During the course of argument on the motion, the court asked DPD Loy if there was anything she would pull back on in cross-examining Piko, and DPD Loy responded that she would not do so.

The circuit court orally denied the motion the day after the hearing. It entered Findings of Fact, Conclusions of Law and Order Denying Defendant Shane Mark's Consolidated Oral Motions for Mistrial and to Withdraw as Counsel on August 16, 2004 (FsOF, CsOL, and Order Denying Motions for Mistrial and Withdrawal of Counsel), which included the following relevant factual findings:

### FINDINGS OF FACT

. . . .

4. Neither Mr. Burks nor the Public Defender's Office have any matters pending with regard to Piko and the Public Defender's Office has closed his file.

. . . .

6. Piko's files, which came in existence during his relationship with Mr. Burks, are in Ho's office and if instructed by the court he would not allow anyone access to the files.

7. [DPD] Ho had no knowledge of either [DPDs Loy or Marshall] having gained access to Piko's files or having learned of any confidential attorney-client communications had between Piko and Mr. Burks.

8. [DPD Loy] had not learned of any secrets of Piko nor did she have knowledge of any confidential attorney-client communications had between Piko and Mr. Burks.

. . . .

10. Piko's conviction for forgery and his status as a probationer are matters of public record, which the Public Defender's Office could acquire.

11. Defendant's trial does not involve either the same or any matter substantially related to the facts and circumstances regarding the case in which Piko was placed on probation.

12. The Public Defender's Office never represented Piko for any matter related to the alleged parking lot shooting for which Defendant is currently standing trial.

13. Piko's prior case with the Public Defender's Office is completely unrelated to any of the circumstances in the instant trial involving Defendant.

. . . .

16. [DPD Loy's] ability to represent zealously the interests of Defendant will not be affected by Piko's status as former client of the Public Defender's Office.

17. [DPD Loy] did not identify any limitation on her ability to represent zealously Defendant due to Mr. Burks' prior representation of Piko.

. . . .

22. Neither [DPDs Loy or Marshall] will attempt to gain access to confidential attorney-client files of Piko created as a result of Mr. Burks' representation of him or knowledge of any confidential attorney-client communications had between them.

23. In order to ensure and prevent any conflicts of interest, the State Public Defender's Office is disqualified immediately from representing John Piko in any matter here on.

The State did not call Piko in its case-in-chief, but Mark called Piko as an adverse witness on July 22, 2004. DPD Loy questioned Piko about the events at the church parking lot. Piko admitted that before Mark pulled the gun and fired several shots, Piko "got kind of mad" at Mark and had told Mark, "What are you gonna do if I just take [the camera] from you." Upon further questioning by DPD Loy, Piko admitted to having been convicted of assault three times, having a temper, and having been convicted of forgery. Piko also admitted that at the time of the incident in the church parking lot, he was on probation, but had missed a urine test. He believed that by testifying in the first trial, the State would end his probation for cooperating in the trial. Piko said he made that deal with a "private investigator ... the one supposedly working for [himself and Paikai]." Piko didn't know where the private investigator was from, just that he met him "one day when Channel 2 news was at [Paikai's] house." Piko testified that, in the end, he did not receive any "breaks" from the prosecution.

The jury could not reach a verdict on the charges relating to Piko, and the circuit court granted Mark's motion to dismiss those charges.

On appeal, Mark argues that the circuit court erred in denying the motions for mistrial and to withdraw. He also claims that the August 16, 2004 FsOF and CsOL "in its entirety" is erroneous. Mark argues that the circuit court erred in denying the motions because "there is imputed disqualification when the office of the public defender represented a prosecution witness in a prior proceeding," and because "concurrent representation of both Mark and Piko by the Office of the Public Defender created a conflict of interest requiring a mistrial and appointment of new counsel."

■ We turn first to Mark's challenge to the circuit court's FsOF. Mark has provided no meaningful argument in support of his position that all of the circuit court's FsOF are clearly erroneous. In the absence of such argument, we affirm the FsOF. HRAP Rule 28(b)(7); *State v. Topasna*, 94 Hawai'i 444, 455, 16 P.3d 849, 860 (App.2000). In any event, there is substantial evidence in the record, as discussed above, to support the findings.[22]

■ We next consider the circuit court's denial of the motion for mistrial and motion to withdraw as counsel. We review the court's denial of the motions for abuse of discretion, *Lagat*, 97 Hawai'i at 495, 40 P.3d

**22.** Mark has failed to provide argument regarding his contention that all of the CsOL are erroneous, and accordingly, we do not address the CsOL individually. HRAP Rule 28(b)(7). However, we address the substance of his contentions in connection with our discussion of the circuit court's denial of his motions.

at 897 (reviewing denial of a motion for mistrial under abuse of discretion standard); *Plichta*, 116 Hawai'i at 214, 172 P.3d at 526 (reviewing denial of a motion to withdraw as counsel under abuse of discretion standard).

Several provisions of the Hawai'i Rules of Professional Conduct (HRPC) are relevant. Rules 1.7, 1.9 and 1.10 state in pertinent part:

## RULE 1.7. CONFLICT OF INTEREST: GENERAL RULE.

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

(2) each client consents after consultation.

. . . .

## RULE 1.9. CONFLICT OF INTEREST: FORMER CLIENT.

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

. . . .

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

## RULE 1.10. IMPUTED DISQUALIFICATION: GENERAL RULE.

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7, 1.8(c), 1.9 or 2.2.

. . . .

(d) The disqualifications of Rules 1.7, 1.9(a), 1.9(b), or 1.11(c)(1) shall not be imputed to government lawyers provided the disqualified government lawyer has been screened from participation in the matter.

Rule 1.10(d) suggests the existence of a threshold question, i.e., whether the OPD should be considered a single law firm for the purposes of this analysis. *See State v. Pitt*, 77 Hawai'i 374, 380, 884 P.2d 1150, 1156 (App.1994) (adopting a "case-by-case approach" to determine whether or not to apply the "private firm principle" of HRPC 1.10 to government offices). However, in view of our application of Rules 1.7 and 1.9 to the circumstances of this case, we need not resolve that question, and we will assume arguendo that OPD was one "firm" within the meaning of HRPC Rule 1.10.

There are substantial differences in the analysis of potential conflicts under Rules 1.7 and 1.9. Rule 1.7 governs the situation in which a lawyer seeks to represent two clients concurrently. It prohibits the lawyer from representing one of those clients when the representation would be "directly adverse" to the other, unless each client consents and other conditions are met. Specifically, Rule 1.7(a) "encompasses the situation in which [criminal] defense counsel represents, in another case, a person who is a prosecution witness in the current case." *State v. Richie*, 88 Hawai'i 19, 44, 960 P.2d 1227, 1252 (1998). In contrast, Rule 1.9 allows a lawyer who has formerly represented a client in a matter to represent another client with adverse interests as long as the two matters are not the same or substantially related, and certain other conditions are met. *Cf. id.* at n. 19 (recognizing the distinction between concurrent representation and "prior representation situations").

In the instant case, OPD's representation of Piko and its representation of Mark did not involve "the same or substantially related matter." HRPC Rule 1.9(a). Thus, if Piko was a former client of the OPD at the time of Mark's second trial, OPD could properly continue to represent Mark under Rule 1.9(a), subject to Rule 1.9(c)'s prohibition on the use or dissemination of information relating to the OPD's representation of Piko.

Rule 1.9 does not define what it means for an attorney to have "formerly" represented a client. The comment to the rule notes only that "[a]fter termination of a client-lawyer relationship, a lawyer may not represent another client except in conformity with this rule." The ABA's Annotated Model Rules of Professional Conduct (5th ed. 2003) ("Annotated Model Rules") notes that "[t]here is no per se rule regarding when a client becomes a former client." Annotated Model Rules at 173.

 Based on the circumstances of OPD's representation of Piko, we conclude that he was a former client of OPD in July 2004. Piko's probation violation had been adjudicated and Piko had been re-sentenced to a new term of probation in April 2004, approximately three months before the second trial.[23] The circuit court found in FOF 4 that the OPD did not "have any matters pending with regard to Piko" in July 2004 and had closed his file, and there is substantial evidence to support that finding. OPD's closing of the file implies that it understood that it would not be called upon to use the file again, absent some unforeseen future event. The mere possibility that such a event could occur is insufficient to convert what would otherwise be former representation into concurrent representation for the purposes of the HRPC. Moreover, there is nothing in the record indicating that Piko had any understanding that his representation by OPD was ongoing after his re-sentencing in April 2004.[24]

Courts from other jurisdictions have found no conflict of interest based on defense counsel's prior representation of a witness, when the witness had already been sentenced before the commencement of trial. *See, e.g., Commonwealth v. Smith,* 362 Mass. 782, 291 N.E.2d 607, 608 (1973) (finding no conflict of interest when witness had been convicted and sentenced five days prior to the commencement of the defendant's trial); *People v. Kloiber,* 95 Ill.App.3d 1061, 51 Ill.Dec. 456, 420 N.E.2d 870, 875–76 (1981) (finding no conflict of interest when witness had been convicted and sentenced to probation and had begun serving his sentence prior to the start of the defendant's trial); *see also Commonwealth v. Balliro,* 437 Mass. 163, 769 N.E.2d 1258, 1263–64 (2002) (finding that attorney's dual representation of defendant and codefendant in the same case did not create a conflict of interest because "the codefendant pleaded guilty to manslaughter," "[t]he case was over," and there was "no evidence of [the attorney's] ongoing representation of the codefendant"); *People v. Hritz,* 244 A.D.2d 230, 231, 664 N.Y.S.2d 281 (N.Y.App.Div.1997) (finding that defendant was not deprived of effective assistance of counsel where Legal Aid Society had also represented the chief prosecution witness in an unrelated case for which the witness was on probation, since defendant's representation was not "affected by the purported conflict" and "[t]rial counsel's cross-examination and summation with respect to the credibility of the witness in question demonstrated sound trial tactics"); *Commonwealth v. Soffen,* 377 Mass. 433, 386 N.E.2d 1030, 1034 (1979) (noting that "[a]lthough there are situations in which a single firm's representation of both a defendant and a witness for the prosecution against the defendant involve the potential for divided loyalty, ... [t]hose cases typically involve representation of an unsentenced prosecution witness who testifies in the same matter in which the firm represents

**23.** An April 14, 2004 Order of Resentencing entered in the circuit court in Cr. No. 01–1–1979, *State of Hawai'i v. John Lopaka Piko,* was included in the record of the instant case.

**24.** Although Piko testified at the July 20, 2004 hearing on the motion for mistrial, his testimony

was limited to whether he was willing to waive any conflict. After initially stating that he was willing to waive any conflict because "[n]o really matter to me[,]" Piko conferred with his temporary counsel and then testified that he was unwilling to waive any conflict.

the defendant"); *cf. In re Darr*, 143 Cal. App.3d 500, 191 Cal.Rptr. 882, 887–92 (1983)(finding simultaneous representation and an actual conflict of interest where public defender represented defendant and remained the attorney of record of key prosecution witness, whose probation revocation hearing was suspended until after he testified against the defendant, and it was evident that public defender did not zealously attempt to undermine witnesses' credibility). *But see Valle v. Florida*, 763 So.2d 1175 (Fla.Ct.App.2000).

The conclusion that Rule 1.9 governs here is also consistent with *Richie*. The defendant in *Richie* was convicted of promoting prostitution, after he had been paid to provide several women to perform as exotic dancers at a bachelor party. One of those women, Monica Alves, had been a codefendant in the case, but the charges against her had been dismissed by the time of Richie's trial. 88 Hawai'i at 44, 960 P.2d at 1252. Richie was represented at trial by two attorneys. *Id.* On appeal, Richie asserted "that the performance of his trial counsel was constitutionally ineffective based on a conflict of interest" where "one of his trial attorneys was representing Monica Alves in a civil suit at the same time the attorney was representing Richie in the present case." *Id.* at 41, 960 P.2d at 1249.

The supreme court concluded that while trial counsel's decision to represent Alves in the civil case was "at the very least, unwise[,] ... under the particular circumstances of this case, we do not believe that trial counsel's relationship with his clients was sufficient to give rise to a conflict of interest." *Id.* at 44, 960 P.2d at 1252. The court observed that (1) by the time Richie's trial began, the charges against Alves had been dismissed, and Alves was no longer a codefendant in Richie's case; (2) although Alves was a potential prosecution witness, she was

not actually called to testify; and (3) that Richie "was represented by *two* attorneys at trial, and ... only one of those was involved in Alves's civil suit." *Id.*

In sum, *Richie* involved potential concurrent representation. The supreme court expressly noted that "prior representation is not at issue in the present case[.]" *Id.* at 44 n. 19, 960 P.2d at 1252 n. 19. Thus, while *Richie* is instructive with regard to the supreme court's application of HRPC Rule 1.7, it is consistent with our conclusion that the circuit court properly determined that Rule 1.9, rather than Rule 1.7, governed the situation here.

■ Although Rule 1.9(a) allows a lawyer to represent a current client in a matter even though the lawyer formerly represented an adverse witness in a matter that was not "the same or substantially related," that authorization is subject to restrictions that appear in Rule 1.9(c), which prohibits attorneys from using or disclosing information relating to the former representation. In the circumstances of this case, the circuit court properly determined that the denial of the motions would not result in a violation of Rule 1.9(c). After conducting an evidentiary hearing, the circuit court found that DPD Loy had not learned of any secrets of Piko and had no knowledge of any confidential communications.[25] It further found that DPD Ho would not allow DPDs Loy or Marshall access to Piko's files if instructed by the court, and that neither DPDs Loy nor Marshall will attempt to gain access to the files or knowledge of any attorney-client communications. Moreover, Piko's conviction for forgery and his status as a probationer were matters of public record, and accordingly, DPD Loy could cross-examine Piko on those matters.[26] *See* HRPC Rule 1.9(c) (information relating to former representation of a client may be

---

**25.** Although the circuit court did not make the same specific finding as to DPD Marshall, the court did find, in FoF 7, that DPD Ho was unaware of either DPD Marshall or DPD Loy having learned of any confidential attorney-client communications. Moreover, there is no evidence in the record to indicate that DPD Marshall had learned the content of any such communications.

**26.** As we noted above, during the July 20, 2004 hearing on the motions, DPD Loy acknowledged that she would not hold back in her cross-examination of Piko, and she could not identify any specific way in which her representation of Mark would be impaired by the OPD's representation of Piko.

used "when the information has become generally known").

Courts from other jurisdictions which found no conflict in former representation cases have emphasized that confidential communications of the prior client were not revealed in the course of the subsequent representation. *See, e.g., Smith*, 291 N.E.2d at 608 (finding no conflict of interest where same attorney represented defendant and prosecution witness on separate matters, and where prosecution witness was sentenced five days prior to the start of defendant's trial; but noting that defendant might be entitled to relief "if there were a showing that [the attorney] was given confidential information [by the prosecution witness] that served to restrict [the attorney's] cross-examination of [the prosecution witness]"); *Le Captain v. State*, 691 So.2d 613 (Fla.Dist.Ct. App.1997) (finding no conflict of interest where public defender representing defendant moved to withdraw on the morning of trial after discovering that another public defender had previously represented a witness for the prosecution, and "the attorney was not possessed of any confidential information obtained from the witness which could have pertained to [the defendant's] trial[,]" representation of the witness occurred eleven years prior, and "[n]o conflict of interest surfaced at the trial").

Moreover, there is nothing in the record establishing that there was any adverse effect on DPD Loy's actual performance at trial. She cross-examined Piko regarding his prior forgery conviction, his probation status and his prior assault convictions. Piko admitted that he had made what could be interpreted as a threatening comment to Mark and that he had a temper (thus supporting Mark's self-defense theory), and that he thought he had a deal when he testified in the first trial (thus impeaching his credibility and establishing the basis for the motion that is the subject of section IV.G.1., infra). Finally, the jury was unable to reach a verdict on the charges related to Piko, and the circuit court dismissed the charges after trial.

Courts that have found no conflict of interest in former representation cases have emphasized that there was no adverse effect on the performance of counsel. *Milane v. State*, 716 So.2d 837 (Fla.Dist.Ct.App.1998) (finding no conflict of interest where another public defender represented a prosecution witness in a separate matter; where defense counsel "specifically responded to the judge's question that he would not feel in any way constrained in his cross-examination of the witness if called by the State to testify against [the defendant]"; and stating that nothing "suggest[ed] … that the cross-examination of the witness at trial was anything other than vigorous"); *Barbaro v. State*, 115 S.W.3d 799, 802 (Tex.App.2003); *see also People v. Wilkins*, 28 N.Y.2d 53, 320 N.Y.S.2d 8, 268 N.E.2d 756, 757–58 (1971) (declining to infer a conflict of interest where Legal Aid Society discovered for the first time on appeal that it had represented the complaining witness in an unrelated criminal proceeding because, inter alia, "there was no actual knowledge of the dual representation" and "defendant does not allege a single factor which might have deterred his counsel from presenting an effective defense, nor does he claim that his defense was not conducted in a capable and diligent manner").

In sum, we conclude that the circuit court correctly analyzed Mark's motions under Rule 1.9, and did not abuse its discretion in denying the motions.

■ Mark also argues that even if the OPD was not concurrently representing Mark and Piko at the time of Mark's second trial in July 2004, the motions should have been granted based on the fact that the OPD was representing both Piko and Mark concurrently in April 2004, when Piko's probation was being revoked and Mark was waiting for his second trial to begin. However, we reject this argument. It is undisputed that the OPD was unaware of that concurrent representation when it was occurring, and thus it had no effect on the representation of either client at that time. In the circumstances of this case, Rules 1.7 and 1.9 do not require after-the-fact disqualification.[27] *See People v. Liberty*, 147 A.D.2d

---

**27.** In reaching that conclusion, we do not mean to suggest that a lawyer will always avoid dis-

502, 504, 537 N.Y.S.2d 596 (N.Y.App.Div. 1989) (finding no per se conflict of interest where different Legal Aid attorneys unknowingly represented the defendant and complaining witness on a different matter); *Hunter v. State*, 817 So.2d 786, 793 (Fla.2002) (where prosecution witness was formerly represented in several unrelated cases by the same public defender's office, the court found that defendant articulated a potential but not actual conflict of interest because defense counsel "was not even aware of the public defender's prior representation" and it "could not have affected his representation of [the defendant]").

Accordingly, we affirm the August 16, 2004 FsOF, CsOL, and Order Denying Motions for Mistrial and Withdrawal of Counsel.

### G. Mark was not denied his right to a fair trial in the second trial

Mark argues that "cumulative errors during the second trial denied [him] of his right to a fair trial." Specifically, Mark claims that (1) the prosecutor committed misconduct by failing to disclose Piko's belief that he had made a "deal" with the State for his testimony against Mark in the first trial, and (2) the circuit court erroneously denied his motion for a mistrial after juror no. 10 received an anonymous voicemail. However, since we conclude that both claims are without merit, we need not address their alleged cumulative effect. *Samuel*, 74 Haw. at 159, 838 P.2d at 1383.

#### 1. Piko's belief that he had made a deal with the State

Prior to Piko's testimony on July 22, 2004, Mark moved to dismiss the case, for a mistrial, and "for a continuance, if that is the appropriate remedy." Mark's counsel stated that she had reviewed a redacted copy of Piko's probation violation report, which the court had provided to Mark after the hearing on the conflict of interest issue. In that report, Cynthia Wahinekapu, Piko's probation officer, had noted that on March 8, 2004, "Piko told her that he ... wanted to know

about the deal he was promised about his testimony in the Gaspar shooting case." Wahinekapu's report further indicated that "she spoke with [the DPA in this case] on that same day," and the DPA "said he had no deal with [Piko], but he was willing ... to tell the court that [Piko] did cooperate." Wahinekapu noted that on March 18, 2004, Piko "again asked about the deal he was supposed to have[,]" and that she advised him of what the DPA told her.

Mark argued that Piko's belief that he had a deal with the State was exculpatory under *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and that the DPA should have informed Mark of it after the DPA was contacted by Wahinekapu. The DPA responded, inter alia, that Piko's claim was "nonsensical" since there was nothing to make a deal about when Piko testified during the first trial, as the motion to revoke Piko's probation had not yet been filed.

The court deferred its ruling until after Wahinekapu could be called to testify. As discussed in section F above, Mark then called Piko as an adverse witness. The following day, Wahinekapu testified outside the presence of the jury. She said that she was Piko's probation officer in March 2004. At that time, there was an outstanding motion for the revocation of his probation. After Piko was picked up by police, he called her from jail and told her that "the investigator had made a deal for his testimony [in the Gaspar shooting case] and that his probation was going to go away[,]" and he "wanted [Wahinekapu] to check on it." Piko did not identify the investigator, or with whom the investigator was associated, but Wahinekapu "assumed it was the prosecution."

Wahinekapu called the prosecutor's office, and spoke with the DPA in this case, Chris Van Marter. According to Wahinekapu, Van Marter stated that investigators do not have the authority to make deals, that the State had not made any deal with Piko, and that "if anything he would ... be willing to speak to

qualification in circumstances where the lawyer was unaware of a potential conflict. Moreover, we emphasize the importance of having effective

procedures in place to timely identify potential conflicts before the representation is undertaken.

either a judge or ... another prosecuting attorney and tell them that [Piko] had cooperated and ... testified in the trial." Wahinekapu had no further contact with Van Marter. At Piko's revocation hearing, Wahinekapu told the judge that "Mr. Van Marter ... said to [her] that [Piko] had testified and cooperated[,]" and the DPA working on Piko's case at that time agreed.

The circuit court denied the motion to dismiss, noting that defense counsel had learned, prior to calling Piko to testify, that Piko was on probation for a felony and that Piko believed that he had made a deal with the State, and had questioned Piko about both of those matters. Accordingly, Mark had not suffered any prejudice as a result of the State's failure to advise him in March 2004 of Piko's belief that he had a deal.

■ "[T]he suppression by the prosecution of evidence favorable to the accused violates due process where the evidence is material to guilt or punishment, regardless of the good faith or bad faith of the prosecution." *State v. Matafeo*, 71 Haw. 183, 185, 787 P.2d 671, 672 (1990) (citing *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)); *State v. Okumura*, 78 Hawai'i 383, 402, 894 P.2d 80, 99 (1995) (stating that "in order to establish a *Brady* violation, an appellant must make a showing that the suppressed evidence would create a reasonable doubt about the [a]ppellant's guilt that would not otherwise exist") (citation, internal quotation marks, and brackets omitted).

The failure of the prosecution to disclose the phone call with Wahinekapu in March 2004 was not a *Brady* violation, since that disclosure would not have created a reasonable doubt that would not otherwise exist. As the circuit court observed, defense counsel learned about Piko's probationary status and his belief that he had a deal prior to calling him to testify, and impeached him about those matters. Moreover, the jury was unable to reach a verdict on the charges relating to Piko, and those charges were subsequently dismissed by the circuit court.

### 2. Phone call to juror no. 10

■ During closing argument in the second trial, juror no. 10 disclosed to the court that she had received a "weird call" on her cell phone. The message replayed for the court stated as follows:

Hello [first name of juror no. 10]. What a name, yeah. I talked to you earlier. (Inaudible) Beretania Safeway, yeah, by [F]irst Hawaiian Bank. I will be there, don't worry. I cannot tell you which vehicle, but I will keep an eye on you, you know that. Watch out, watch your back. Bye bye.

Juror no. 10 had told four other jurors about the phone call. The court excused juror no. 10, because she had a work-related training to attend. The court questioned the other four jurors, who said that they told juror no. 10 to report the call to the bailiff, but also stated that the message would not in any way affect their ability to be fair. Defense counsel stated, "I'm moving that these jurors be excused and for mistrial." The court denied the motion, stating:

I've seen the demeanor, heard the answers of these jurors, and they seem very forthright, and they seem very certain that they can be fair and set aside whatever it is they may have thought with regard to this ... matter. And I—it seems it's ... not at all clear, and they realize this, that there is any connection between this message and this case. So I—there's little doubt in my mind that this is not going to impede your client's right to a fair trial, and the motion is denied.

The court individually voir dired the rest of the jurors. Although several stated they overheard something about the call, all said it would not affect their ability to be fair. The court concluded, "There was no hesitation in their answers, and there's ... not enough for me to find that they cannot be fair in this case or that they cannot set this matter aside."

■ The circuit court did not abuse its discretion in denying the motion for a mistrial or in failing to dismiss all of the jurors. The circuit court "is in a better position than the appellate court to ascertain from the

answers of the juror whether the juror is able to be fair and impartial." *State v. Cardus*, 86 Hawai'i 426, 438, 949 P.2d 1047, 1059 (App.1997) (finding that the decision to excuse a juror for cause is left to the "sound discretion of the trial judge") (citation omitted). Given the ambiguous nature of the call, together with the answers given by the jurors to the court's questions and the court's assessment of their credibility, the circuit court did not abuse its discretion. *Id.*

## H. There was substantial evidence to convict Mark of the second degree attempted assault of Officer Sung

 Mark argues that there was insufficient evidence to support his conviction of the attempted first degree assault of Officer Sung. We disagree.

Officer Sung testified at the second trial that as he struggled with Mark on the floor of Baskin–Robbins, Mark was "swinging" the gun, then "curled his arm and then pointed [the] gun at [Sung's] direction, and [Sung] could see . . . [that] his finger was on the trigger." The gun was pointed "[s]traight into [Sung's] face." Sung used "all [his] strength and tried to twist his arms away from [Sung's] head and then tried to point the gun into . . . the freezer area." Sung feared for his life and was "using all [of his] might." Sung kept yelling, "Stop resisting," and bit Mark's tricep and bicep, but Mark "kept pulling [the gun] in, toward [Sung's] face." Officer Sung's testimony was corroborated by that of Officer Higa and Detective Kawakami.

Viewing the evidence in the light most favorable to the State, there was "credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution," *Richie*, 88 Hawai'i at 33, 960 P.2d at 1241 (internal quotation marks and citation omitted), to conclude that Mark "[i]ntentionally engage[d] in conduct which . . . constitute[d] a substantial step in a course of conduct intended to culminate" in the "serious bodily injury" of Officer Sung, HRS §§ 705–500, 707–710.

## I. Mark's extended sentences must be vacated

Mark also argues that the circuit court erred in sentencing him to extended terms of imprisonment in *Mark II*.[28] The circuit court found that Mark was a "persistent" and "multiple" offender whose extended imprisonment was "necessary for the protection of the public." HRS § 706–662 (Supp.2003) The court accordingly sentenced him to a term of life imprisonment without the possibility of parole on Count I, 20 years of imprisonment on Count II, life with the possibility of parole with a mandatory minimum of 10 years on Count III, 20 years on Count IV, 10 years with a mandatory minimum of 2.5 years on Count V, and 10 years imprisonment on Count VI, with the sentences to be served concurrently to each other, and to the sentences in *Mark I*.

Mark argues that the extended terms of imprisonment violated his constitutional rights since the circuit court engaged in "judicial factfinding." The State concedes that the extended sentences violated Mark's constitutional right to trial by jury, and we concur. Until recently, the determination that an extended term was necessary for the protection of the public was considered to be "a traditional exercise of discretion by the sentencing judge." *State v. Maugaotega*, 115 Hawai'i 432, 437, 168 P.3d 562, 567 (2007). However, in *Maugaotega*, the supreme court concluded that HRS § 706–662 was unconstitutional since it allowed the sentencing court, rather than the trier of fact, to make the necessary findings. *Id.* at 446–47, 168 P.3d at 576–77.

After the decision in *Maugaotega*, the legislature amended HRS §§ 706–661, –662, and –664 to require that a jury, or the court if the defendant waives the right to a jury determination, find the facts necessary to impose an extended term of imprisonment beyond a reasonable doubt. 2007 Haw. Sess. L., 2d Spec. Sess., Act 1, § 2–4. Those

---

**28.** In *Mark I*, the circuit court denied the State's motion to impose extended sentences, and sentenced Mark to a term of 5 years of imprisonment on Count II, 20 years of imprisonment with a mandatory minimum of 10 years on Count IV, and 10 years of imprisonment on Count V, with the sentences to be served concurrently.

amendments applied retroactively, *id.* at § 1, and provide that "[a] defendant whose extended term of imprisonment is set aside or invalidated shall be resentenced pursuant to this Act upon the request of the prosecutor[,]" *id.* at § 5; *see State v. Jess,* 117 Hawai'i 381, 413, 184 P.3d 133, 165 (2008) (determining that Act 1 is not unconstitutional).

In the instant case, the circuit court made the necessary findings instead of a jury, and accordingly the extended term sentences it imposed are unconstitutional under *Maugaotega.* On remand, the State may request that Mark be resentenced to extended terms in accordance with Act 1, or may request the imposition of non-extended sentences.

### V. CONCLUSION

We affirm Mark's convictions, but vacate his extended term sentences as required by the decision of the Hawai'i Supreme Court in *Maugaotega,* and remand for resentencing. The August 2, 2004 Judgment in *Mark I,* Criminal No. 03-1-0495, is affirmed in its entirety since the Judgment did not include any extended term sentences. The August 2, 2004 Judgment in *Mark II,* Criminal No. 03-1-0496, is affirmed with regard to the merits of Mark's convictions, but the extended term sentences in the Judgment are vacated and that case is remanded for proceedings consistent with this opinion.